CHAPMAN, COMMISSIONER, DEPARTMENT OF
HUMAN RESOURCES OF TEXAS, ET AL. *v.*
HOUSTON WELFARE RIGHTS
ORGANIZATION ET AL.

No. 77–719.   Argued October 2, 1978—Decided May 14, 1979*

---

*Together with No. 77–5324, *Gonzalez, Guardian* v. *Young, Director, Hudson County Welfare Board, et al.,* on certiorari to the United States Court of Appeals for the Third Circuit.

Stevens, J., delivered the opinion of the Court, in which Burger, C. J., and Blackmun, Powell, and Rehnquist, JJ., joined. Powell, J., filed a concurring opinion, in which Burger, C. J., and Rehnquist, J., joined, *post*, p. 623. White, J., filed an opinion concurring in the judgment, *post*, p. 646. Stewart, J., filed a dissenting opinion, in all but n. 2 of which Brennan and Marshall, JJ., joined, *post*, p. 672. Brennan and Marshall, JJ., filed a separate statement, *post*, p. 676.

*David H. Young,* Assistant Attorney General of Texas, argued the cause for petitioners in No. 77–719. With him on the brief were *John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Steve Bickerstaff,* Assistant Attorney General. *Theodore A. Gardner* argued the cause and filed briefs for petitioner in No. 77–5324.

*Jeffrey J. Skarda* argued the cause for respondents in No. 77–719. With him on the briefs were *Henry A. Freedman, Michael B. Trister,* and *John Williamson. Stephen Skillman,* Assistant Attorney General of New Jersey, argued the cause for respondents in No. 77–5324. With him on the brief were *John J. Degnan,* Attorney General, and *Richard M. Hluchan,* Deputy Attorney General.†

Mr. Justice Stevens delivered the opinion of the Court.

The United States District Courts have jurisdiction over civil actions claiming a deprivation of rights secured by the Constitution of the United States or by Acts of Congress pro-

---

†Briefs of *amici curiae* urging affirmance in No. 77–719 were filed by *Solicitor General McCree* and *Sara Sun Beale* for the United States; and by *Robert B. O'Keefe* for East Texas Legal Services, Inc.

*Ronald Y. Amemiya,* Attorney General, and *Michael A. Lilly* and

viding for equal rights or for the protection of civil rights, including the right to vote.[1]   The question presented by these cases is whether that jurisdiction encompasses a claim that a state welfare regulation is invalid because it conflicts with the Social Security Act.   We conclude that it does not.

In the Social Security Amendments of 1967, Congress authorized partial federal funding of approved state programs providing emergency assistance for certain needy persons.[2] In February 1976, Julia Gonzalez, the petitioner in No. 77–5324, requested the Hudson County, N. J., Welfare Board to pay her $163 in emergency assistance funds to cover her rent and utility bills.[3]   The Board denied her request because

---

*Charleen M. Aina,* Deputy Attorneys General, filed a brief for the State of Hawaii as *amicus curiae* in No. 77–719.

[1] "The district courts shall have original jurisdiction of any civil action authorized .by law to be commenced by any person:

.            .            .            .            .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." 28 U. S. C. §§ 1343 (3) and (4).

Jurisdiction under § 1343 (4), it should be noted, is not limited to actions against state officials or individuals acting under color of state law.

[2] § 206, 81 Stat. 893; see 42 U. S. C. § 606 (e) (1).  The program is fully described in *Quern* v. *Mandley,* 436 U. S. 725.

[3] "[Petitioner] resides with her two children in Jersey City, New Jersey.  Each month, she receives $235.00 under the Aid to Families with Dependent Children program (AFDC), 42 U. S. C. § 601 *et seq.,* as well as $157.00 under the Social Security Administration's disability program for her one retarded son.  On February 2, 1976, Gonzalez received and cashed both checks at a neighborhood food market.  Upon leaving the store, she was accosted by a robber who stole the cash.  The following day she explained her situation to the Hudson County Welfare Board, request-

petitioner and her children were not "in a state of homelessness" as required by the relevant New Jersey regulations.[4]

Petitioner brought suit in the United States District Court for the District of New Jersey alleging that the emergency payment was "necessary to avoid destitution" within the meaning of § 406 (e)(1) of the federal Social Security Act,[5] and she was therefore entitled to the payment notwithstanding the more stringent New Jersey regulation. In her federal complaint she sought damages of $163 and an injunction

---

ing $163.00 in emergency assistance funds to cover her rent and utility bills." 560 F. 2d 160, 163 (CA3 1977).

[4] "When because of an emergent situation over which they have had no control or opportunity to plan in advance, the eligible unit is in a state of homelessness; and the County Welfare Board determines that the providing of shelter and/or food and/or emergency clothing, and/or minimum essential house furnishings are necessary for health and safety, such needs may be recognized in accordance with the regulations and limitations in the following sections." N. J. Admin. Code § 10:82–5.12 (1976).

[5] Section 406 (e)(1), as set forth in 42 U. S. C. § 606 (e)(1), provides:

"The term 'emergency assistance to needy families with children' means any of the following, furnished for a period not in excess of 30 days in any 12-month period, in the case of a needy child under the age of 21 who is (or, within such period as may be specified by the Secretary, has been) living with any of the relatives specified in subsection (a)(1) of this section in a place of residence maintained by one or more of such relatives as his or their own home, but only where such child is without available resources, the payments, care, or services involved are necessary to avoid destitution of such child or to provide living arrangements in a home for such child, and such destitution or need for living arrangements did not arise because such child or relative refused without good cause to accept employment or training for employment—

"(A) money payments, payments in kind, or such other payments as the State agency may specify with respect to, or medical care or any other type of remedial care recognized under State law on behalf of, such child or any other member of the household in which he is living, and

"(B) such services as may be specified by the Secretary;

"but only with respect to a State whose State plan approved under section 602 of this title includes provision for such assistance."

commanding the New Jersey Welfare Director to conform his administration of the State's emergency assistance program to federal statutory standards. In essence, petitioner claimed that the New Jersey officials had deprived her of a right to emergency assistance protected by § 406 (e)(1) of the Social Security Act.

The District Court held that the complaint stated a claim under 42 U. S. C. § 1983.[6] Without deciding whether the "secured by the Constitution" language in § 1343 (3) should be construed to include Supremacy Clause claims,[7] the District Court concluded that it had jurisdiction under both subparagraphs (3) and (4) of § 1343. But in doing so, the court did not explain whether it was § 1983 or § 406 (e)(1) of the Social Security Act that it viewed as the Act of Congress securing "equal rights" or "civil rights." On the merits, the District Court found no conflict between the state regulation and the federal statute and entered summary judgment for respondents.

The Court of Appeals for the Third Circuit did not address the merits because it concluded that the District Court should have dismissed the complaint for want of jurisdiction.[8] In

---

[6] 418 F. Supp. 566, 569 (1976).

Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[7] Article VI, cl. 2, of the United States Constitution provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[8] 560 F. 2d, at 169.

reaching this conclusion, the Court of Appeals first noted that § 1983 "is not a jurisdictional statute; it only fashions a remedy." 560 F. 2d 160, 164 (1977). Nor could jurisdiction be founded on 28 U. S. C. § 1331,[9] the general federal-question jurisdictional statute, since the amount in controversy did not exceed $10,000. The court recognized that when a constitutional claim is of sufficient substance to support federal jurisdiction, a district court has power to consider other claims which might not provide an independent basis for federal jurisdiction.[10] But it concluded that the constitutional claim must involve more than a contention that the Supremacy Clause requires that a federal statute be given effect over conflicting state law. It then went on to hold that the Social Security Act is not an Act of Congress securing either "equal rights" or "civil rights" as those terms are used in § 1343. And those terms, the court concluded, limit the grant of federal jurisdiction conferred by § 1343 even if § 1983 creates a remedy for a broader category of statutory claims.

The petitioners in No. 77–719 are Commissioners of the Texas Department of Human Resources, which administers the State's program of Aid to Families with Dependent Children (AFDC). Respondents represent a class of AFDC recipients who share living quarters with a nondependent relative. Under the Texas regulations, the presence in the household of a nondependent person results in a reduction in the level of payments to the beneficiaries even if their level of actual need is unchanged. In a suit brought in the United

---

[9] Section 1331 (a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States, except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity."

[10] See, e. g., King v. Smith, 392 U. S. 309; Townsend v. Swank, 404 U. S. 282.

States District Court for the Southern District of Texas, respondents claimed that the Texas regulations violate § 402 (a)(7) of the Social Security Act, 42 U. S. C. § 602 (a)(7), and the federal regulations promulgated pursuant thereto.[11]

The District Court upheld the Texas regulations.[12] While respondents' appeal was pending, this Court decided *Van Lare* v. *Hurley,* 421 U. S. 338. On the authority of that case, the Court of Appeals for the Fifth Circuit reversed.[13] Following earlier Fifth Circuit cases, the Court of Appeals concluded that federal jurisdiction was conferred by the language in 28 U. S. C. § 1343 (4) describing actions seeking relief "under any Act of Congress providing for the protection of civil rights . . . ." The court reasoned that statutory rights concerning food and shelter are " 'rights of an essentially personal nature,' " *Houston Welfare Rights Org.* v. *Vowell,* 555 F. 2d 1219, 1221 n. 1 (1977); that 42 U. S. C. § 1983 provides a remedy which may be invoked to protect such rights; and that § 1983 is an Act of Congress providing for the protection of civil rights within the meaning of that jurisdictional grant.[14]

We granted certiorari to resolve the conflict between that conclusion and the holding of the Third Circuit in No. 77–5324. 434 U. S. 1061. We have previously reserved the jurisdictional question we decide today, see *Hagans* v. *Lavine,* 415 U. S. 528, 533–534, n. 5. We preface our decision with a review of the history of the governing statutes.

I

Our decision turns on the construction of the two jurisdictional provisions, 28 U. S. C. §§ 1343 (3) and (4), and their

---

[11] 45 CFR, §§ 233.20 (a)(3)(ii)(C), 233.90 (a) (1974).

[12] *Houston Welfare Rights Org.* v. *Vowell,* 391 F. Supp. 223 (1975).

[13] *Houston Welfare Rights Org.* v. *Vowell,* 555 F. 2d 1219 (1977).

[14] It will be noted that the Court of Appeals did not hold that the Social Security Act was itself an Act of Congress of the kind described in the jurisdictional statute.

interrelationship with 42 U. S. C. § 1983 and the Social Security Act. As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve.

Section 1 of the Civil Rights Act of 1871 is the source of both the jurisdictional grant now codified in 28 U. S. C. § 1343 (3) and the remedy now authorized by 42 U. S. C. § 1983.[15] Section 1 authorized individual suits in federal court to vindicate the deprivation, under color of state law, "of any rights, privileges, or immunities secured by the Constitution of the United States." No authorization was given for suits based on any federal statute.

In 1874, Congress enacted the Revised Statutes of the United States. At that time, the remedial and jurisdictional provisions of § 1 were modified and placed in separate sections. The words "and laws," as now found in § 1983, were included in the remedial provision of Rev. Stat. § 1979,[16] and two quite

---

[15] The first section of *"An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes"* reads as follows:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An Act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases." 17 Stat. 13.

[16] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be sub-

different formulations of the jurisdictional grant were included in Rev. Stat. §§ 563 and 629. The former granted the district courts jurisdiction of all actions to redress a deprivation under color of state law of any right secured by the Constitution or "by any law of the United States." [17] The latter defined the jurisdiction of the circuit courts and included the limiting phrase—"by any law providing for equal rights"—which is now found in § 1343 (3). [18]

In the Judicial Code of 1911, Congress abolished circuit courts and transferred their authority to the district courts.[19] The Code's definition of the jurisdiction of the district courts to redress the deprivation of civil rights omitted the broad language referring to "any law of the United States" which had defined district court jurisdiction under § 563, and provided instead for jurisdiction over claims arising under federal laws "providing for equal rights"—the language which had been used to describe circuit court jurisdiction under § 629,

---

jected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Rev. Stat. § 1979.

[17] Subparagraph "Twelfth" of § 563 authorized district court jurisdiction "[o]f all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, ordinance, regulation, custom, or usage of any State, of any right, privilege, or immunity secured by the Constitution of the United States, or of any right secured by any law of the United States to persons within the jurisdiction thereof."

[18] Subparagraph "Sixteenth" of § 629 granted the circuit courts original jurisdiction "[o]f all suits authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

[19] 36 Stat. 1087, 1167.

and which is now a part of § 1343 (3).[20]   No significant change in either the remedial or jurisdictional language has been made since 1911.[21]

Subsection 4 of § 1343, providing jurisdiction for claims "under any Act of Congress providing for the protection of civil rights, including the right to vote," is of more recent origin.   Part III of the Civil Rights Act of 1957, as proposed, authorized the Attorney General to institute suits for injunctive relief against conspiracies to deprive citizens of the civil rights specified in 42 U. S. C. § 1985, which includes voting rights.[22]   Part III conferred jurisdiction on the United States district courts to entertain proceedings instituted pursuant to this section of the Act.[23]   While the substantive authorization of suits by the Attorney General was defeated, the amendment of § 1343, which had been termed a technical amendment to comply with the authority conferred by Part III,[24] was enacted into law.

With the exception of this most recent enactment, the legislative history of the provisions at issue in these cases ultimately provides us with little guidance as to the· proper resolution of the question presented here.   Section 1 of the 1871 Act was the least controversial provision of that Act; [25]

[20] See § 24 (14), 36 Stat. 1092.

[21] The sections have, of course, been renumbered.

[22] H. R. 6127, § 121, 85th Cong., 1st Sess. (1957).

[23] *Ibid.*   In addition to conferring federal jurisdiction, the bill also provided that such suits should be entertained without regard to exhaustion by the aggrieved party of administrative or other judicial remedies.

[24] See H. R. Rep. No. 291, 85th Cong., 1st Sess., 11 (1957) ("Section 122 amends section 1343 of title 28, United States Code.   These amendments are merely technical amendments to the Judicial Code so as to conform it with amendments made to existing law by the preceding section of the bill").

[25] The Act of 1871, known as the Ku Klux Klan Act, was directed at the organized terrorism in the Reconstruction South led by the Klan, and the unwillingness or inability of state officials to control the widespread violence.   Section 1 of the Act generated the least concern; it merely

and what little debate did take place as to § 1 centered largely on the question of what protections the Constitution in fact afforded.[26] The relevant changes in the Revised Statutes were adopted virtually without comment, as was the definition of civil rights jurisdiction in the 1911 Code. The latter provision was described as simply merging the existing jurisdiction of the district and circuit courts,[27] a statement which may be read either as reflecting a view that the broader "and laws" language was intended to be preserved in the more limited "equal rights" language or as suggesting that "and laws" was itself originally enacted with reference to laws providing for equal rights, and was never thought to be any broader.

Similar ambiguity is found in discussions of the basic policy of the legislation. While there is weight to the claim that Congress, from 1874 onward, intended to create a broad right of action in federal court for deprivations by a State of any federally secured right, it is also clear that the prime focus of Congress in all of the relevant legislation was ensuring a right of action to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto.

We cannot say that any of these arguments is ultimately

---

added civil remedies to the criminal penalties imposed by the 1866 Civil Rights Act. See Cong. Globe, 42d Cong., 1st Sess., 568 (1871) (remarks of Sen. Edmunds); *id.*, at App. 68 (remarks of Rep. Shellabarger). The focus of the heated debate was on the succeeding sections of the Act, which included provisions imposing criminal and civil penalties for conspiracies to deprive individuals of constitutional rights, and authorizing the President to suspend the writ of habeas corpus and use armed forces to suppress "insurrection." §§ 2–5, 17 Stat. 13; see Cong. Globe, 42d Cong., 1st Sess., App. 220 (1871) (remarks of Sen. Thurman). See generally Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1153–1156 (1977).

[26] See Cong. Globe, 42d Cong., 1st Sess., 577 (1871) (remarks of Sen. Trumbull); Developments, *supra* n. 25, at 1155.

[27] See S. Rep. No. 388, 61st Cong., 2d Sess., pt. 1, p. 15 (1910); H. R. Doc. No. 783, 61st Cong., 2d Sess., pt. 1, p. 19 (1910).

right or wrong, or that one policy is more persuasive than others in reflecting the intent of Congress. It may well be that, at least as to § 1343 (3), the Congresses that enacted the 1871 Act and its subsequent amendments never considered the question of federal jurisdiction of claims arising under the broad scope of federal substantive authority that emerged many years later. This does not mean that jurisdiction cannot be found to encompass claims nonexistent in 1871 or 1874, but it cautions us to be hesitant in finding jurisdiction for new claims which do not clearly fit within the terms of the statute.[28]

## II

The statutory language suggests three different approaches to the jurisdictional issue. The first involves a consideration of the words "secured by the Constitution of the United States" as used in § 1343. The second focuses on the remedy authorized by § 1983 and raises the question whether that section is a statute that secures "equal rights" or "civil rights" within the meaning of § 1343. The third approach makes the jurisdictional issue turn on whether the Social Security Act is a statute that secures "equal rights" or "civil rights." We consider these approaches in turn.

### 1. *The Supremacy Clause*

Under § 1343 (3), Congress has created federal jurisdiction of any civil action authorized by law to redress the deprivation under color of state law "of any right, privilege or immunity secured [1] by the Constitution of the United States or [2] by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United

---

[28] This caution is also mandated by the settled rule that the party claiming that a court has power to grant relief in his behalf has the burden of persuasion on the jurisdictional issue, *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189, especially when he is proceeding in a court of limited jurisdiction. *Turner* v. *Bank of North America*, 4 Dall. 8, 11.

States." Claimants correctly point out that the first preposi-
tional phrase can be fairly read to describe rights secured by
the Supremacy Clause. For even though that Clause is not a
source of any federal rights, it does "secure" federal rights by
according them priority whenever they come in conflict with
state law.[29] In that sense all federal rights, whether created
by treaty, by statute, or by regulation, are "secured" by the
Supremacy Clause.

In *Swift & Co.* v. *Wickham,* 382 U. S. 111, the Court was
confronted with an analogous choice between two interpreta-
tions of the statute defining the jurisdiction of three-judge
district courts.[30] The comprehensive language of that statute,
28 U. S. C. § 2281 (1970 ed.),[31] could have been broadly read to

---

[29] "The argument that the phrase in the statute 'secured by the Con-
stitution' refers to rights 'created,' rather than 'protected' by it, is not
persuasive. The preamble of the Constitution, proclaiming the establish-
ment of the Constitution in order to 'secure the Blessings of Liberty,' uses
the word 'secure' in the sense of 'protect' or 'make certain.' That the
phrase was used in this sense in the statute now under consideration was
recognized in *Carter* v. *Greenhow,* 114 U. S. 317, 322, where it was held
as a matter of pleading that the particular cause of action set up in the
plaintiff's pleading was in contract and was not to redress deprivation of
the 'right secured to him by that clause of the Constitution' [the con-
tract clause], to which he had 'chosen not to resort.' See, as to other
rights protected by the Constitution and hence secured by it, brought
within the provisions of R. S. § 5508, *Logan* v. *United States,* 144 U. S.
263; *In re Quarles and Butler,* 158 U. S. 532; *United States* v. *Mosley,*
238 U. S. 383." *Hague* v. *CIO,* 307 U. S. 496, 526–527 (opinion of
Stone, J.).

[30] The three-judge court statute, including the language at issue in
*Swift & Co.* v. *Wickham,* was originally enacted in 1910, 36 Stat. 557, at
a time when the Judicial Code of 1911 was under active consideration.

[31] When *Swift & Co.* was decided, § 2281 provided:

"An interlocutory or permanent injunction restraining the enforcement,
operation or execution of any State statute by restraining the action of
any officer of such State in the enforcement or execution of such statute or
of an order made by an administrative board or commission acting under
State statutes, shall not be granted by any district court or judge thereof

encompass statutory claims secured by the Supremacy Clause or narrowly read to exclude claims that involve no federal constitutional provision except that Clause. After acknowledging that the broader reading was consistent not only with the statutory language but also with the policy of the statute, the Court accepted the more restrictive reading. Its reasoning is persuasive and applicable to the problems confronting us in this case.

"This restrictive view of the application of § 2281 is more consistent with a discriminating reading of the statute itself than is the first and more embracing interpretation. The statute requires a three-judge court in order to restrain the enforcement of a state statute 'upon the ground of the unconstitutionality of such statute.' Since all federal actions to enjoin a state enactment rest ultimately on the Supremacy Clause, the words 'upon the ground of the unconstitutionality of such statute' would appear to be superfluous unless they are read to exclude some types of such injunctive suits. For a simple provision prohibiting the restraint of the enforcement of any state statute except by a three-judge court would manifestly have sufficed to embrace every such suit whatever its particular constitutional ground. It is thus quite permissible to read the phrase in question as one of limitation, signifying a congressional purpose to confine the three-judge court requirement to injunction suits depending directly upon a substantive provision of the Constitution, leaving cases of conflict with a federal statute (or treaty) to follow their normal course in a single-judge court." *Swift & Co.* v. *Wickham, supra,* at 126–127 (footnotes omitted).

Just as the phrase in § 2281—"upon the ground of the

---

*upon the ground of the unconstitutionality of such statute* unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." (Emphasis added.)

unconstitutionality of such statute"—would have been super-
fluous unless read as a limitation on three-judge-court juris-
diction, so is it equally clear that the entire reference in § 1343
(3) to rights secured by an Act of Congress would be unneces-
sary if the earlier reference to constitutional claims embraced
those resting solely on the Supremacy Clause. More impor-
tantly, the additional language which describes a limited
category of Acts of Congress—those "providing for equal rights
of citizens"—plainly negates the notion that jurisdiction over
*all* statutory claims had already been conferred by the pre-
ceding reference to constitutional claims.

Thus, while we recognize that there is force to claimants'
argument that the remedial purpose of the civil rights leg-
islation supports an expansive interpretation of the phrase
"secured by the Constitution," it would make little sense for
Congress to have drafted the statute as it did if it had
intended to confer jurisdiction over every conceivable federal
claim against a state agent. In order to give meaning to the
entire statute as written by Congress, we must conclude that
an allegation of incompatibility between federal and state
statutes and regulations does not, in itself, give rise to a
claim "secured by the Constitution" within the meaning of
§ 1343 (3).

## 2. *Section 1983*

Claimants next argue that the "equal rights" language of
§ 1343 (3) should not be read literally or, if it is, that § 1983,
the source of their asserted cause of action, should be consid-
ered an Act of Congress "providing for equal rights" within
the meaning of § 1343 (3) or "providing for the protection of
civil rights" within § 1343 (4). In support of this position,
they point to the common origin of §§ 1983 and 1343 (3) in
the Civil Rights Act of 1871 and this Court's recognition that
the latter is the jurisdictional counterpart of the former.[32]

---

[32] See *Lynch* v. *Household Finance Corp.*, 405 U. S. 538, 540, 543;
*Examining Board* v. *Flores de Otero*, 426 U. S. 572, 583.

Since broad language describing statutory claims was used in both provisions during the period between 1874 and 1911 and has been retained in § 1983, and since Congress in the Judicial Code of 1911 purported to be making no changes in the existing law as to jurisdiction in this area, the "equal rights" language of § 1343 (3) must be construed to encompass all statutory claims arising under the broader language of § 1983. Moreover, in view of its origin in the Civil Rights Act of 1871 and its function in modern litigation, § 1983 does "provid[e] for the protection of civil rights" within the meaning of § 1343 (4).

In practical effect, this argument leads to the same result as claimants' Supremacy Clause argument: jurisdiction over all challenges to state action based on any federal ground. Although the legislative history does not forbid this result, the words and structure of the statute, as well as portions of the legislative history, support a more limited construction.

The common origin of §§ 1983 and 1343 (3) unquestionably implies that their coverage is, or at least originally was, coextensive. It is not, however, necessary in this case to decide whether the two provisions have the same scope. For even if they do, there would still be the question whether the "and laws" language in § 1983 should be narrowly read to conform with the "equal rights" language in § 1343 (3), or, conversely, the latter phrase should be broadly read to parallel the former. And, in all events, whether or not we assume that there is a difference between "any law of the United States" on the one hand and "any Act of Congress providing for equal rights" on the other, the fact is that the more limited language was used when Congress last amended the jurisdictional provision. In order to construe the broad language of § 1983 to cover any statutory claim, and at the same time to construe the language of § 1343 (3) as coextensive with such a cause of action, it would be necessary to ignore entirely Congress' most recent limiting amendment and the words of the provision as currently in force.

We cannot accept claimants' argument that we should reach this result by holding that § 1983 is an Act of Congress "providing for equal rights" within the meaning of § 1343 (3). Unlike the 1866 and 1870 Acts,[33] § 1 of the Civil Rights Act of 1871 did not provide for any substantive rights—equal or otherwise. As introduced and enacted, it served only to ensure that an individual had a cause of action for violations of the Constitution, which in the Fourteenth Amendment embodied and extended to all individuals as against state action the substantive protections afforded by § 1 of the 1866 Act.[34] No matter how broad the § 1 cause of action may be, the breadth of its coverage does not alter its procedural character. Even if claimants are correct in asserting that § 1983 provides a cause of action for all federal statutory claims, it remains true that one cannot go into court and claim a "violation of § 1983"—for § 1983 by itself does not protect anyone against anything. As Senator Edmunds recognized in the 1871 debate: "All civil suits, as every lawyer understands, which this act authorizes, are not based upon it;

---

[33] The Act of April 9, 1866, 14 Stat. 27, the forerunner to the Fourteenth Amendment, in its first section declared all persons born in the United States to be citizens and provided that all citizens should have the same rights to make and enforce contracts, to sue, to purchase, lease, sell, or hold property, and to full and equal benefit of all laws as is enjoyed by white citizens. The Act of May 31, 1870, 16 Stat. 140, which followed the passage of the Fifteenth Amendment, was directed at enforcing the declared right of every citizen to vote in all elections without regard to race.

[34] Indeed, the view that § 1 of the 1871 Act was "merely carrying out the principles of the civil rights bill [of 1866] which have since become a part of the Constitution" may well explain why it was subject to the least debate of any section of that Act. Cong. Globe, 42d Cong., 1st Sess., 568 (1871) (remarks of Sen. Edmunds). See also id., at 429 (remarks of Rep. McHenry). Section 1 of the 1871 Act was modeled after § 2 of the 1866 Act, which provided criminal sanctions for violations of the rights declared by that Act.

618

they are based upon the right of the citizen. The act only gives a remedy." [35]

Under § 1343 (3), a civil action must be both "authorized by law" and brought to redress the deprivation of rights "secured by the Constitution of the United States or by any Act of Congress providing for equal rights." Section 1983, when properly invoked, satisfies the first requirement: It ensures that the suit will not be dismissed because not "authorized by law." But it cannot satisfy the second, since by its terms, as well as its history, it does not provide any rights at all.

We reach a similar conclusion with respect to the argument that § 1983 is a statute "providing for the protection of civil rights, including the right to vote." Standing alone, § 1983 clearly provides no protection for civil rights since, as we have just concluded, § 1983 does not provide any substantive rights at all. To be sure, it may be argued that § 1983 does in some sense "provid[e] for the protection of civil rights" when it authorizes a cause of action based on the deprivation of civil rights guaranteed by other Acts of Congress. But in such cases, there is no question as to jurisdiction, and no need to invoke § 1983 to meet the "civil rights" requirement of § 1343 (4); the Act of Congress which is the actual substantive basis of the suit clearly suffices to meet the requisite test.[36] It is only when the underlying statute is *not* a civil rights Act that § 1983 need be invoked by those in claimants' position to support jurisdiction. And in such cases, by hypothesis, § 1983 does not "provid[e] for the protection of civil rights."

To construe § 1343 (4), moreover, as encompassing all federal statutory suits, as claimants here propose, would seem plainly inconsistent with the congressional intent in passing that statute. As noted earlier, the provision's primary pur-

[35] Cong. Globe, 42d Cong., 1st Sess., 568 (1871). See also 560 F. 2d, at 169.

[36] Where the underlying right is based on the Constitution itself, rather than an Act of Congress, § 1343 (3) obviously provides jurisdiction.

pose was to ensure federal-court jurisdiction over suits which the bill authorized the Attorney General to bring against conspiracies to deprive individuals of the civil rights enumerated in 42 U. S. C. § 1985.[37] The statute, of course, is broader than that: It encompasses suits brought by private individuals as well, and thus retained some significance even after the provisions authorizing suit by the Attorney General were defeated. But to the extent that § 1343 (4) was thought to expand existing federal jurisdiction, it was only because it does not require that the claimed deprivation be "under color of any State law."[38] One would expect that if Congress sought

---

[37] See H. R. Rep. No. 291, 85th Cong., 1st Sess., 10 (1957):

"Section 1985 of title 42, United States Code, often referred to as the Ku Klux Act, provides a civil remedy in damages to a person damaged as a result of conspiracies to deprive one of certain civil rights. The law presently is comprised of three subsections; the first establishes liability for damages against any person who conspires to interfere with an officer of the United States in the discharge of his duties and as a result thereof injures or deprives another of rights or privileges of a citizen of the United States; the second subsection establishes liability for damages against any person who conspires to intimidate or injure parties, witnesses, or jurors involved in any court matter or who conspires to obstruct the due process of justice in any State court made with the intent to deny to any citizen the equal protection of the laws as the result of the conspiracies for injury or deprivation of another's rights or privileges as a citizen of the United States; the third subsection establishes liability for damages against any person who conspires to deprive another of equal protections of the laws or of equal privileges and immunities under the laws, or of the right to vote in elections affecting Federal offices if the result is to injure or deprive another of rights and privileges of a citizen of the United States.

"The effect of the provisions of the proposed bill on existing law as contained in title 42, United States Code, section 1985 is not to expand the rights presently protected but merely to provide the Attorney General with the right to bring a civil action or other proper proceeding for relief to prevent acts or practices which would give rise to a cause of action under the three existing subsections."

[38] See 103 Cong. Rec. 12559 (1957) (remarks of Sen. Case):

"My intent in proposing the idea of leaving in the bill section 122, re-

620

not only to eliminate any state-action requirement but also to allow jurisdiction without respect to the amount in controversy for claims which in fact have nothing to do with "civil rights," there would be some indication of such an intent. But there is none, either in the legislative history or in the words of the statute itself.

## 3. *The Social Security Act*

It follows from what we have said thus far that § 1343 does not confer federal jurisdiction over the claims based on the Social Security Act unless that Act may fairly be characterized as a statute securing "equal rights" within § 1343 (3) or "civil rights" within § 1343 (4). The Social Security Act provisions at issue here authorize federal assistance to participating States in the provision of a wide range of monetary benefits to needy individuals, including emergency assistance and payments necessary to provide food and shelter. Arguably, a statute that is intended to provide at least a minimum level of subsistence for all individuals could be regarded as securing either "equal rights" or "civil rights." [39] We are persuaded,

---

numbered as section 121, was to strengthen the so-called right to vote. The section would amend existing law so as to clarify the jurisdiction of the district courts in the entertainment of suits to recover damages, or to secure equitable or other relief under any act of Congress providing for the protection of civil rights, including the right to vote. . . .

   .           .           .           .           .

"[T]he addition of a subparagraph 4 in section 1343 is not limited by the clause 'under color of any statute, ordinance, regulation, custom, or order of any State or Territory,' to which the preceding paragraph is subject.

"So in that sense the new subparagraph 4, which would be left in Part III, is complementary to, and is perhaps somewhat broader than existing law. So it does not limit the suit to recover damages to a case in which the injury occurs under color of law."

[39] Cf. *Gomez* v. *Florida State Employment Service,* 417 F. 2d 569, 580 n. 39 (CA5 1969) (rights secured by the Social Security Act are "rights of an essentially personal nature").

however, that both of these terms have a more restrictive meaning as used in the jurisdictional statute.

The Social Security Act does not deal with the concept of "equality" or with the guarantee of "civil rights," as those terms are commonly understood. The Congress that enacted § 1343 (3) was primarily concerned with providing jurisdiction for cases dealing with racial equality; the Congress that enacted § 1343 (4) was primarily concerned with providing jurisdiction for actions dealing with the civil rights enumerated in 42 U. S. C. § 1985, and most notably the right to vote. While the words of these statutes are not limited to the precise claims which motivated their passage,[40] it is inappropriate to read the jurisdictional provisions to encompass new claims which fall well outside the common understanding of their terms.

Our conclusion that the Social Security Act does not fall within the terms of either § 1343 (3) or (4) is supported by this Court's construction of similar phrases in the removal statute, 28 U. S. C. § 1443. The removal statute makes reference to "any law providing for the equal civil rights of citizens" and "any law providing for equal rights." In construing these phrases in *Georgia* v. *Rachel*, 384 U. S. 780, this Court concluded:

"The present language 'any law providing for . . . equal civil rights' first appeared in § 641 of the Revised Statutes of 1874. When the Revised Statutes were compiled, the substantive and removal provisions of the Civil Rights Act of 1866 were carried forward in separate sections. Hence, Congress could no longer identify the rights for which removal was available by using the language of the original Civil Rights Act—'rights secured to them by the first section of this act.' The new

---

[40] As to § 1343 (4), see *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 412 n. 1 (Civil Rights Act of 1866); *Allen* v. *State Board of Elections*, 393 U. S. 544, 554 (Voting Rights Act of 1965).

622

language it chose, however, does not suggest that it intended to limit the scope of removal to rights recognized in statutes existing in 1874. On the contrary, Congress' choice of the open-ended phrase 'any law providing for . . . equal civil rights' was clearly appropriate to permit removal in cases involving 'a right under' both existing and future statutes that provided for equal civil rights.

"There is no substantial indication, however, that the general language of § 641 of the Revised Statutes was intended to expand the kinds of 'law' to which the removal section referred. In spite of the potential breadth of the phrase 'any law providing for . . . equal civil rights,' it seems clear that in enacting § 641, Congress intended in that phrase only to include laws comparable in nature to the Civil Rights Act of 1866. . . .

> . . . . .

". . . As the Court of Appeals for the Second Circuit has concluded, § 1443 'applies only to rights that are granted in terms of equality and not to the whole gamut of constitutional rights . . . .' 'When the removal statute speaks of "any law providing for equal rights," it refers to those laws that are couched in terms of equality, such as the historic and the recent equal rights statutes, as distinguished from laws, of which the due process clause and 42 U. S. C. § 1983 are sufficient examples, that confer equal rights in the sense, vital to our way of life, of bestowing them upon all.' *New York* v. *Galamison,* 342 F. 2d 255, 269, 271. See also *Gibson* v. *Mississippi,* 162 U. S. 565, 585–586; *Kentucky* v. *Powers,* 201 U. S. 1, 39–40; *City of Greenwood* v. *Peacock,* [384 U. S. 808,] 825." *Id.,* at 789–790, 792 (footnotes omitted).

In accord with *Georgia* v. *Rachel,*[41] the Courts of Appeals have

---

[41] The removal statute was enacted in the Civil Rights Act of 1866 under the authority of the Thirteenth Amendment; §§ 1343 (3) and (4),

consistently held that the Social Security Act is not a statute providing for "equal rights." See *Andrews* v. *Maher*, 525 F. 2d 113 (CA2 1975); *Aguayo* v. *Richardson*, 473 F. 2d 1090, 1101 (CA2 1973), cert. denied *sub nom. Aguayo* v. *Weinberger*, 414 U. S. 1146 (1974). We endorse those holdings, and find that a similar conclusion is warranted with respect to § 1343 (4) as well. See *McCall* v. *Shapiro*, 416 F. 2d 246, 249 (CA2 1969).

We therefore hold that the District Court did not have jurisdiction in either of these cases. Accordingly, the judgment in No. 77–5324 is affirmed, and the judgment in No. 77–719 is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join,. concurring.

I join the Court's opinion [1] and agree that it is not necessary in these cases to decide the meaning of the phrase "Constitution and laws" in 42 U. S. C. § 1983. See *ante,* at 616. MR. JUSTICE WHITE has taken a contrary view, however, and has concluded that because the statute now codified as § 1983 includes the words "and laws," it provides a private cause of action for the deprivation, under color of state law, of any federal statutory right. Anyone who ventures into the thicket of the legislative history of § 1983 quickly realizes that

on the other hand, are based upon the authority of the Fourteenth Amendment which, unlike the Thirteenth Amendment, is not limited to racially based claims of inequality. As a result, while an Act of Congress must in fact deal with equal rights or civil rights to support jurisdiction under § 1343, it need not be stated only in terms of racial equality. Cf. *Georgia* v. *Rachel,* 384 U. S., at 792.

[1] I join MR. JUSTICE STEVENS' opinion for the Court on the understanding that it draws no conclusions about the legislative history of 28 U. S. C. § 1343 (3) beyond those necessary to support its rather narrow holding with respect to the scope of that statute. I do not necessarily agree with every observation in the Court's opinion concerning the history of the post-Civil War civil rights legislation.

there is no clearly marked path to the correct interpretation of this statute. Yet, there is sufficient evidence to indicate convincingly that the phrase "and laws" was intended as no more than a shorthand reference to the equal rights legislation enacted by Congress. Because I do not think MR. JUSTICE WHITE's interpretation can survive careful examination of the legislative history of § 1983, I write separately.

## I

Section 1983 provides a private cause of action for the deprivation, under color of state law, of "rights . . . secured by the Constitution and laws." [2] An examination of the genesis of this statute makes clear the hazard of viewing too expansively the statute's broad reference to "laws." Pursuant to legislative direction, see Act of June 27, 1866, 14 Stat. 74, President Andrew Johnson appointed three distinguished jurists to constitute a commission to simplify, organize, and consolidate all federal statutes of a general and permanent nature. These revisers and their successors spent several years in producing the volume enacted by Congress as the Revised Statutes of 1874. See Dwan & Feidler, The Federal Statutes—Their History and Use, 22 Minn. L. Rev. 1008, 1012–1015 (1938). Section 1983 first appeared in its present form as § 1979 of the Revised Statutes,[3] which in turn was derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13. It was in the 1874 revision that the words "and laws" were added.

---

[2] Title 42 U. S. C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] Revised Stat. § 1979 is identical to 42 U. S. C. § 1983. For convenience, the former designation is used throughout most of this opinion.

The history of the revision makes abundantly clear that Congress did not intend the revision to alter the content of federal statutory law. The Act of Congress authorizing the revision discloses no warrant to do so. 14 Stat. 74. In reporting to the House on the progress of their task, the revisers advised that, while some changes in the wording of federal statutes were necessary, "[e]very essential provision of the existing laws must be reproduced, with such additions only by the [revisers] as shall give to these provisions their intended effect." Report of the Commissioners to Revise the Statutes of the United States, H. R. Misc. Doc. No. 31, 40th Cong., 3d Sess., 2 (1869). Before the work was approved by Congress, it was scrutinized, at the behest of a joint congressional committee, for nine months by Thomas Jefferson Durant, an attorney not involved in the initial drafting, for the express purpose of detecting changes and restoring the original meaning. See 2 Cong. Rec. 646 (1874) (remarks of Rep. Poland); *id.,* at 129 (remarks of Rep. Butler); Dwan & Feidler, *supra,* at 1013–1014. Thereafter it was reviewed by both the House Committee on Revision of the Laws, see 2 Cong. Rec. 646 (1874) (remarks of Rep. Poland), and by the House itself in a series of special evening sessions, see *infra,* at 638–639, for the purpose of making *"such changes and amendments as [are] necessary to make [sure] that it will be an exact transcript, an exact reflex, of the existing statute law of the United States—that there shall be nothing omitted and nothing changed."* 2 Cong. Rec. 646 (1874) (remarks of Rep. Poland) (emphasis added). Members of Congress who urged enactment of the revision into positive law stated unequivocally that no substantive changes were intended. For example, Senator Conkling, chairman of the Senate Committee on the Revision of the Laws, in reporting the revision to the Senate, said:

"[A]lthough phraseology of course has been changed, the aim throughout has been to preserve absolute identity of

meaning, not to change the law in any particular, however minute, but to present . . . the law in all its parts as it was actually found to exist dispersed through seventeen volumes of statutes." *Id.*, at 4220.[4]

In spite of these efforts, it may have been inevitable in an undertaking of such magnitude that changes in the language of some statutes arguably would alter their meaning. When confronted with such changes, we should remember the " 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' " *Muniz* v. *Hoffman,* 422 U. S. 454, 469 (1975) (quoting *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459 (1892)). I do not foreclose

---

[4] Supporters in the House were equally emphatic in their assurances that no substantive changes were contained in the revision:

"I desire to premise here that [the House Committee on Revision of the Laws] felt it their bounden duty not to allow, so far as they could ascertain, any change of the law. This embodies the law as it is. The temptation, of course, was very great, where a law seemed to be imperfect, to perfect it by the alteration of words or phrases, or to make some change. But that temptation has, so far as I know and believe, been resisted. We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense. All that has been done is to strike out the obsolete parts and to condense and consolidate and bring together statutes *in pari materia;* so that you have here, except in so far as it is human to err, the laws of the United States under which we now live." 2 Cong. Rec. 129 (1873) (remarks of Rep. Butler, introducing H. R. 1215).

"[T]he committee have endeavored to have this revision a perfect reflex of the existing national statutes. We felt aware that if anything was introduced by way of change into those statutes it would be impossible that the thing should ever be carried through the House. In the multitude of matters that come before Congress for consideration, if we undertake to perfect and amend the whole body of the national statutes there is an end of any expectation that the thing would ever be carried through either House of Congress, and therefore the committee have endeavored to eliminate from this everything that savors of change in the slightest degree of the existing statutes." *Ibid.* (remarks of Rep. Poland).

the possibility that some statutory change attributable solely to the 1874 revision may be accepted at face value. See *United States* v. *Sischo,* 262 U. S. 165, 168–169 (1923). But certainly the better wisdom is that "an insertion [of language] in the Revised Statutes . . . is not lightly to be read as making a change . . . ." *Ibid.*

I therefore am unable to accept uncritically the view that merely because the phrase "and laws" was inserted into the predecessor of § 1983 during the revision, that statute henceforth must be read as embracing all federal rights. The presence of this addition merely launches the inquiry into the legislative intent behind the present wording of § 1983.[5]

## II

### A

The history of § 1983 begins with the Civil Rights Act of 1866, 14 Stat. 27. Section 1 of the Act guaranteed all citizens of the United States "the same right . . . to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property . . . as is enjoyed by white citizens." Section 2 made it a misdemeanor for any person, acting under color of state law, to deprive another of the rights enumerated in § 1. Jurisdiction over the criminal actions described in § 2, as well as over civil actions to enforce the rights granted in § 1, was provided by § 3, which stated in part:

> "[T]he district courts of the United States . . . shall have . . . cognizance . . . , concurrently with the circuit courts of the United States, of all causes, civil and crimi-

---

[5] Whatever value ordinarily lies in focusing exclusively on the "plain words [of the] civil rights legislation originating in the post-Civil War days," *post,* at 649, is certainly eclipsed by the need to examine carefully alterations produced by the revisers, whose congressionally mandated task was to preserve, not to change, the meaning of the federal statutes.

nal, affecting persons who are denied . . . any of the rights secured to them by the first section of this act . . . ."

The first three sections of the 1866 Act were the models for parts of two subsequent civil rights statutes. First, §§ 16 and 17 of the 1870 Civil Rights Act, 16 Stat. 144, were copied, with some changes, directly from §§ 1 and 2 of the 1866 Act,[6] and § 18 stated that §§ 16 and 17 were to "be enforced according to the provisions of said act"—i. e., the jurisdictional provisions of § 3 of the 1866 law.[7] Second, § 1 of the Civil Rights Act of 1871, 17 Stat. 13, known as the Ku Klux Klan Act, was modeled after § 2 of the 1866 law. Rather than providing for criminal liability, however, it granted a private civil cause of action; and in place of the enumerated rights of § 1 of the 1866 Act, it encompassed the deprivation, under color of state law, of "any rights, privileges, or immunities secured by the Constitution of the United States." Concurrent circuit and district court jurisdiction over these civil actions was to be governed by § 3 of the 1866 Act, which again was incorporated by reference. Section 1 of the 1871 Act is the direct ancestor of § 1983.

The statutes discussed above were among the civil rights and related jurisdictional provisions in force when the task of producing the Revised Statutes was commenced. Of immediate concern, of course, is § 1 of the 1871 Act, which became § 1979 of the Revised Statutes and, finally, 42 U. S. C. § 1983. As that statute came to the revisers, it extended only to deprivations, under color of state law, of rights "secured by the Constitution." As it left their hands, this phrase had been

_____

[6] Section 16 of the 1870 Act repeated only some of the rights enumerated in § 1 of the 1866 Act, but these were granted to "all persons within the jurisdiction of the United States," rather than, as in the 1866 Act, to "citizens of the United States." For a discussion of § 17 of the 1870 Act, see Part III, *infra*.

[7] Section 18 of the 1870 Act also re-enacted in full the 1866 Act, incorporating it by reference.

altered to read "secured by the Constitution and laws." The problem is to discover whether the revisers and the Congress that accepted their work intended, by the addition of the two words "and laws," greatly to expand the coverage of the statute to encompass every federal statutory right. See *post,* at 654.

## B

A primary source of information about the meaning of the Revised Statutes is a two-volume draft published by the revisers in 1872. Revision of the United States Statutes as Drafted by the Commissioners Appointed for that Purpose (1872) (hereinafter Draft). This Draft provides insight into the thinking of its authors in two ways: It contains marginal notations indicating the sources from which each section of the proposed text was derived, and it includes explanatory notes following some of the proposed provisions, discussing problems encountered by the revisers and justifying the use of particular word choices.[8]

As it appears in the Draft (and in the final text), § 1979 creates a cause of action for the deprivation of "rights . . . secured by the Constitution and laws." The only indication in the Draft concerning the language of § 1979 is the marginal notation showing that it was derived from § 1 of the 1871 Civil Rights Act. Although the revisers gave no direct explanation for their insertion of the reference to "laws," their reasons for that change are revealed by a close examination of similar modification made in the jurisdictional counterparts to § 1979.

As part of their general scheme of organizing the federal statutes, the revisers consolidated all the jurisdictional provisions of the Statutes at Large in the "Judiciary" title of the revision. As noted above, § 3 of the 1866 Act had been relied

---

[8] The final version of the Revised Statutes retains the marginal indications of the source of each section, but omits the explanatory notes. The final version contains limited cross-referencing; the Draft does not.

upon by Congress to provide concurrent jurisdiction in the district and circuit courts for the civil actions authorized by § 1979. As each of these courts was dealt with in separate chapters in the "Judiciary" title, the jurisdictional authority of § 3 was written into two separate provisions. One was § 563 (12), placed under the chapter dealing with the district courts; the counterpart in the chapter on circuit court jurisdiction was § 629 (16).[9] Both sections mirrored closely the language of § 1979, and the marginal notations for each indicated that both were derived from precisely the same source.[10]

In spite of this identity of origin and purpose, these two jurisdictional provisions contained a difference in wording. Section 563 (12) provided district court jurisdiction over civil actions brought to redress the deprivation, under color of state law, of rights secured by the Constitution, or "of any right secured by any law of the United States." Section 629 (16), by contrast, contained, in place of the latter phrase, the words "of any right secured by any law providing for equal rights." Fortunately, in including a reference to laws in § 629 (16), the revisers provided what they omitted in their drafts of §§ 563 (12) and 1979: a detailed and lengthy note explaining their reasons for going beyond the language of the prior civil rights statutes. 1 Draft 359. This note not only makes explicit the meaning of the words "any law providing for equal rights," it discloses the correct interpretation of the analogous language in §§ 563 (12) and 1979 as well.

---

[9] The title, chapter, and section numbers used in the 1872 Draft differ from those employed in the final version adopted by Congress. For the sake of simplicity, however, the provisions of the Draft will be discussed under the numbers ultimately assigned in the 1874 revision.

[10] The marginal notations accompanying §§ 563 (12) and 629 (16) actually list three sources: § 1 of the 1871 Act, §§ 16 and 18 of the 1870 Act, and § 3 of the 1866 Act. As explained above, the relevant sections of the 1870 and 1871 legislation merely incorporated by reference the jurisdictional provisions originally written into § 3 of the 1866 Act. Section 3, then, was actually the sole source of both § 563 (12) and § 629 (16).

As part of a larger argument justifying some of the differences in language between § 629 (16) in the revision and § 3 of the 1866 Act,[11] the revisers' note makes an important statement concerning the relationship between the broad language of § 1 of the 1871 Act, from which § 1979 was taken, and the earlier statutes providing for specifically enumerated rights:

> "It may have been the intention of Congress to provide, by [§ 1 of the 1871 Act], for all the cases of [the enumerated] deprivations mentioned in [§ 16 of] the previous act of 1870, and thus actually to supersede the

---

[11] As shown above, see *supra*, at 629–630, and n. 10, the terms of § 3 of the 1866 Act had been relied upon by Congress to provide jurisdiction for § 1 of the 1866 Act and § 16 of the 1870 Act, appearing in the revision as §§ 1977 and 1978, as well as for § 1979. The revisers therefore understood that the text in the revision representing § 3 had to provide jurisdiction over civil actions brought to enforce all of the rights covered by these three civil rights provisions.

Recognizing this, the revisers in their note first justify the language in § 629 (16) extending jurisdiction only over suits brought to "redress the deprivation" of certain rights. Section 3 of the 1866 Act had referred to actions "affecting persons" who had been denied certain rights. The revisers reasoned that Congress could not have meant the latter phrase literally, as this would have created concurrent circuit and district court jurisdiction over any action whatsoever—"for the recovery of lands, or on promissory notes, . . . or for the infringement of patent or copyrights," 1 Draft 361—by anyone who coincidentally had been denied his civil rights. The revisers therefore concluded that Congress meant to provide jurisdiction only over suits to *redress* the deprivation of civil rights.

The revisers sought support for this conclusion from the wording of § 1 of the 1871 Act which, although it had incorporated by reference the "affecting persons who are denied" jurisdictional language of § 3 of the 1866 Act, provided for civil liability against anyone who subjected another to the "deprivation" of rights secured by the Constitution. Accordingly, the revisers inferred Congress' wish that victims of civil rights violations should have access to the federal courts only to redress those violations, not to pursue all other kinds of litigation. It was at this point in their argument that the revisers made the statement quoted and discussed in the text below.

indefinite provisions contained in that act.[12]   But as it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended, it is deemed safer to add a reference to the civil-rights act." [13]   1 Draft 362.

This passage reflects the revisers' understanding that Congress intended by its reference in § 1 of the 1871 Act to "rights . . . secured by the Constitution" to make unlawful the deprivation

---

[12] The statement that the provisions of § 16 of the 1870 Act are "indefinite" apparently is a reference to the fact that § 16 was less definite than § 1 of the 1871 Act in demonstrating a congressional intent to limit federal jurisdiction to the redress of actual *deprivations* of federal rights. See n. 11, *supra.* Section 1 contained the definite phrase *"deprivation* of any rights . . . secured by the Constitution" (emphasis added), while § 16 merely stated that persons "shall have" certain rights.

[13] It is unclear why the revisers said that "any law providing for equal rights" is a reference to § 16 of the 1870 Civil Rights Act rather than to its predecessor, § 1 of the 1866 Act, or to civil rights Acts generally.   The revisers' immediate focus on § 16 is perhaps explained by their apparent conclusion that that provision had superseded § 1 of the 1866 Act with respect to those rights mentioned in both places. As noted *supra,* at 628, and n. 6, § 16 introduced some changes in wording when it restated certain of the § 1 rights, and the § 16 version appeared in the revision as § 1977.   Moreover, the marginal note to § 1977 lists only § 16 as its source.

The revisers did not believe that § 1 of the 1866 Act had been made entirely obsolete by § 16 of the 1870 Act, however, for § 1978 in the Draft consists of an enumeration of the § 1 rights not repeated in § 16: those dealing with the right to hold, purchase, and convey property.   Accurately reflecting the text of § 1, these rights are extended only to "citizens of the United States." See n. 6, *supra.* The marginal note identifies § 1 as the source of § 1978.

Whatever their reasons for referring only to § 16 of the 1870 Act as an illustration of the rights § 1979 was thought to protect against infringement by those acting under color of state law, it is evident from the context of their discussion that the revisers were concerned generally with civil rights legislation enumerating particular rights as authorized by the recently adopted Fourteenth Amendment, and perhaps by the Thirteenth and Fifteenth as well.

under color of state law of any right enumerated in § 1 of the 1866 Act and § 16 of the 1870 Act. The revisers doubtless were aware that § 1 of the 1871 Act was intended by Congress as a legislative implementation of the first section of the Fourteenth Amendment, which in turn was intended to constitutionalize the enumerated rights of § 1 of the 1866 Act. See Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323, 1329–1334 (1952); tenBroek, Thirteenth Amendment to the Constitution of the United States—Consummation to Abolition and Key to the Fourteenth Amendment, 39 Calif. L. Rev. 171, 200–202 (1951); *ante,* at 617, and n. 34. They therefore believed that § 1 of the 1866 Act, to the extent it protected against deprivations under color of state law, was meant to be fully encompassed by the phrase "rights . . . secured by the Constitution" in § 1 of the 1871 Act. But realizing that the courts likely would read this phrase restrictively, it was "deemed safer" to add to "rights . . . secured by the Constitution," as it appeared in § 629 (16), a second phrase—"or . . . secured by any law providing for equal rights"—as a shorthand reference to the civil rights legislation granting specified rights.[14]

---

[14] This demonstrates that MR. JUSTICE STEVENS' opinion for the Court in these cases clearly is correct in its reading of the phrase "any Act of Congress providing for equal rights" in § 1343 (3). These words were chosen carefully to refer to legislation providing for equality in the enjoyment of civil rights and should not be construed more broadly than their plain meaning permits.

The revisers' reference to "every right secured by a law authorized by the Constitution" does not in any way indicate their belief that § 629 (16), by its reference to "any law providing for equal rights," would extend the courts' jurisdiction to every suit involving statutory rights of every kind. On the contrary, the revisers' note merely reflects their concern that, in general, courts would not interpret "rights secured by the Constitution" to extend to *any* federal statutory right. If this were the case, then even those rights originally created in the Civil Rights Acts—rights which had been understood by Congress, when drafting § 1 of the 1871 Act, to be "constitutional rights" because of their unique relationship with § 1 of the

634

Although § 563 (12) refers generally to "any law of the United States," it is manifest that the revisers intended §§ 563 (12) and 629 (16) to be identical in scope. The two provisions were derived from precisely the same sources in the Statutes at Large, see n. 10, *supra*, and there is no indication whatsoever that in separating the two the revisers intended to give them different meanings. Indeed, in the explanatory note to § 629 (16), the revisers made explicit their awareness that the problems confronting them with respect to circuit court jurisdiction applied equally to the district courts, since those two tribunals were to have identical, concurrent jurisdiction over all matters to which § 629 (16) extended. After explaining why § 3 of the 1866 Act, if taken literally, would greatly broaden federal jurisdiction, see n. 11, *supra*, the revisers stated:

> "[I]t can hardly be supposed that Congress designed, not only to open the doors of the *circuit courts* to these parties without reference to the ordinary conditions of citizenship and amount in dispute, but, in their behalf, to convert the *district courts* into courts of general common law and equity jurisdiction. It seems to be a reasonable construction, therefore, that instead of proposing an incidental but complete revolution in the character and functions of the *district courts*, as a measure of relief to parties who are elsewhere denied certain rights, Congress intended only to give a remedy in direct redress of that deprivation, and to allow that remedy to be sought in the courts of the United States." 1 Draft 361 (emphasis added).

It appears that two jurisdictional provisions were created simply because the revisers elected to write separate chapters for the district and circuit courts.

In light of these considerations, the difference in the wording of §§ 563 (12) and 629 (16) must be ascribed to oversight,

---

Fourteenth Amendment—would not have been within the scope of §§ 1979, 629 (16), and 563 (12), absent the added reference to statutory law.

rather than to an intent to give the former provision greater scope than the latter.[15] Having ascertained that §§ 563 (12) and 629 (16) have the same scope, one can conclude only that the more restrictive language of § 629 (16) governs § 563 (12) as well, as the former was given more care and deliberation, and its language more precisely reflects the express understanding of the revisers.[16] It is understandable, therefore, that when the original jurisdiction of the circuit courts was eliminated in the Judicial Code of 1911, the more precisely drafted circuit court provision was chosen to replace the broader district court statute. It thus was § 629 (16) that became 28 U. S. C. § 1343 (3), a selection undoubtedly made by the drafters of the Judicial Code in recognition of the fact that this provision expresses more accurately the original intent of Congress than does § 563 (12). See Note, 72 Colum. L. Rev., *supra* n. 15, at 1423, and n. 152.

The fact that the revisers understood the words "any law" in § 563 (12) to refer only to the equal rights laws enacted by Congress necessarily illuminates the meaning of the similar, contemporaneously drafted reference in § 1979. The legisla-

---

[15] See Note, Federal Jurisdiction Over Challenges to State Welfare Programs, 72 Colum. L. Rev. 1404, 1421–1423 (1972). The various subdivisions of the revision were assigned to different individuals for drafting. See Report of the Commissioners, S. Misc. Doc. No. 3, 42d Cong., 2d Sess., 1–2 (1871). It, therefore, is not surprising that different language should be used to express a single idea in statutes appearing in different parts of the revision.

In his separate opinion, MR. JUSTICE WHITE states that the Revised Statutes in other instances "provided different circuit and district court jurisdiction for causes which, prior to the revision, could be heard in either court." *Post,* at 669 n. 46. Whether or not the differences between district and circuit court jurisdiction to which he adverts were intended by the revisers, the issue here is what the evidence reveals regarding this particular difference between §§ 563 (12) and 629 (16). As I have shown, the history indicates that these two statutes were intended to be identical in scope.

[16] Accord, Note, 72 Colum. L. Rev., *supra* n. 15, at 1421–1423.

tive history shows unmistakably that the revisers drafted §§ 563 (12) and 629 (16) for the precise purpose of providing jurisdiction for actions brought under § 1979.[17]   Just as the difference in wording between the two jurisdictional provisions is, in light of the historical evidence, not a persuasive reason for concluding that they differ in meaning, the variation between §§ 629 (16) and 1979 does not justify a construction that gives the latter a vastly broader scope than its jurisdictional counterpart.   Indeed, only recently the Court decided in *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976), that despite an unexplained difference in the language of §§ 1979 and 629 (16) that was introduced during the 1874 revision, these statutes must be construed as identical in scope.[18]   426 U. S., at 580–586.   A similar approach to the language under scrutiny here is equally correct.

The explanatory note accompanying § 629 (16) makes perfectly clear that the revisers attributed to Congress the understanding that the particularly described rights of §§ 1977 and 1978 were protected against deprivation under color of state law by the words "rights . . . secured by the Constitution" in § 1979.   Out of an abundance of caution, however, a

---

[17] In the final version of the revision, both § 563 (12) and § 629 (16) contain an explicit cross-reference to § 1979. In addition, the marginal notations in both the Draft and the final version of all three sections indicate the common origin discussed above. See *supra,* at 629–630, and n. 10.

[18] In *Examining Board* v. *Flores de Otero,* the Court concluded that the addition by the revisers of the words "or Territory" to § 1979, giving that statute application beyond the boundaries of the States of the Union, reflected the intent of Congress in light of such explicit evidence as Rev. Stat. § 1891, which provided: "The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect . . . in every Territory hereafter organized as elsewhere within the United States."   Despite the fact that no reference to Territories of the United States was added to § 563 (12) or § 629 (16), the Court concluded that these provisions were intended to be identical in scope with § 1979. (The Court's opinion in *Flores de Otero* discusses these statutes mostly under their current section numbers, § 1983 and § 1343 (3).)

phrase was added to these words wherever they appeared. In § 629 (16), to which particular attention was devoted, the addition was "or of any right secured by any law providing for equal rights." In § 563 (12) it was less precise: "or of any right secured by any law." In § 1979 the relevant language became "secured by the Constitution and laws." Despite the variations between these phrases, I am fully persuaded that each was intended to express the same meaning that is explicitly attributed by the revisers to the text of § 629 (16).[19] One might wish that the revisers had expressed themselves with greater precision, but when viewed in the context of the purpose and history of this legislation, it becomes evident that the insertion by the revisers of "and laws" in § 1979 was intended to do no more than ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute.[20]

---

[19] Although many of the commentators who have grappled with the problem of reconciling or explaining the differences in the language of §§ 563 (12), 629 (16), and 1979 argue, largely on the basis of their view of judicial policy, that the plain language of § 629 (16) should be ignored in favor of the apparently broader sweep of § 1979, they do not seriously contend that the two may differ in scope. *E. g.,* Note, The Propriety of Granting a Federal Hearing for Statutorily Based Actions Under the Reconstruction-Era Civil Rights Acts: *Blue* v. *Craig,* 43 Geo. Wash. L. Rev. 1343, 1371–1373 (1975); Note, 72 Colum. L. Rev., *supra* n. 15, at 1425–1426; Herzer, Federal Jurisdiction Over Statutorily-Based Welfare Claims, 6 Harv. Civ. Rights-Civ. Lib. L. Rev. 1, 7–9 (1970); Cover, Establishing Federal Jurisdiction in Actions Brought to Vindicate Statutory (Federal) Rights When No Violations of Constitutional Rights Are Alleged, 2 Clearinghouse Rev., No. 16, pp. 5, 24–25 (Feb.–Mar. 1969). But see Note, The Proper Scope of the Civil Rights Acts, 66 Harv. L. Rev. 1285, 1292–1293 (1953). Thus, under the rationale adopted by most of the commentators that support his position, MR. JUSTICE WHITE's concession that § 1343 (3) must be read narrowly is irreconcilable with his assertion regarding the scope of § 1983.

[20] Once it is understood that "and laws" in § 1979 is equivalent in meaning to "any law providing for equal rights" in § 629 (16), it remains

Indeed, any other conclusion is unsupportable. It would be remarkable if the same revisers who disavowed any intent to make substantive changes in federal law and drafted § 629 (16) as the jurisdictional partner to § 1979 would, without any comment whatsoever,[21] add language to § 1979 for the purpose of making its coverage markedly incongruent with that of § 629 (16), at the same time expanding its scope far beyond that originally provided by Congress. Indeed, as an illustration of what they were confident Congress had *not* intended with the jurisdictional counterpart to § 1979, the revisers raised the specter of opening the federal courts to actions completely unrelated to the deprivation of civil rights. See n. 11, *supra*. Yet MR. JUSTICE WHITE would hold that just such a result was accomplished when the words "and laws" quietly appeared in § 1979.

The underlying historical question, of course, is not simply what the revisers intended, but what Congress meant by the language of § 1979 as it finally was enacted. In light of Congress' clearly expressed purpose not to alter the meaning of prior law, see Part I, *supra,* it cannot be argued, absent some indication to the contrary, that Congress intended "and laws" to mean anything other than what was understood by the revisers, as shown above.

Nor was Congress merely silent on this issue. The bill to enact the revision into positive law received considerable attention in the House, where two special night sessions were convened each week for as long as necessary to allow all Members wishing to scrutinize the bill to do so until the

---

to determine precisely what is meant by an "equal rights" law. That problem is not presented by these cases. There is no need here to go beyond the Court's decision that the Social Security Act is not such a law.

[21] The absence of any comment by the revisers on § 1979 is especially significant in light of the fact that their general practice apparently was to add an explanatory note to the 1872 Draft whenever they believed their proposed language might be construed as effecting a change in existing law. See 2 Cong. Rec. 648 (1874) (remarks of Rep. Hoar).

entire document had been reviewed.[22]   See 2 Cong. Rec. 646–
650 (1874).   During these meetings, many amendments were
adopted, see, *e. g., id.,* at 819–829, 849–858, 995–1001, 2709–
2714, each on the understanding that it was restorative of the
original meaning of the Statutes at Large, and not an amend-
ment to existing law.   See *id.,* at 647–648 (remarks of Rep.
Poland).   During one of these sessions, Representative Law-
rence observed that the work of revision necessarily required
changes in the language of the original statutes.   He illus-
trated the method used by the revisers by inviting his col-
leagues to compare the original text of the very civil rights
statutes at issue here with the corresponding text of the re-
vision.   Included in the statutes read verbatim were § 1 of
the 1871 Act, which, of course, does not contain the reference
to "laws," and the text of § 1979, which does.   In the course
of his remarks Representative Lawrence said: "A comparison
of . . . these will present a fair specimen of the manner in
which the work has been done, and from these all can judge
of the accuracy of the translation."   2 Cong. Rec., at 827–828.
The House was convened for the sole purpose of detecting lan-
guage in the revision that changed the meaning of existing
law.   From the absence of any comment at this point in the
session, one may infer that no one present thought that § 1979
would effect such a change.[23]

[22] The Senate did not give the bill the degree of attention it enjoyed in
the House.   After the latter had passed the bill, the Senate adopted it
without amendment after only a very brief discussion.   See 2 Cong. Rec.
4284–4286 (1874).

[23] The implication in MR. JUSTICE WHITE's opinion that his position is
supported by Representative Lawrence's comments on this occasion is
simply contradicted by the record.   See *post,* at 664–665, and n. 40.   Given
the setting in which the comments were made, Congress' awareness that
the language of § 1979 had been altered indicates its understanding that
no change in substance had been effected.   Representative Lawrence's
statement that the final text of Rev. Stat. § 5510, as opposed to the Draft
version of that statute, was broad enough "to include all [the rights]
covered" by § 1 of the 1871 Act, 2 Cong. Rec. 828 (1874), does no more

In spite of the unchallenged body of evidence to the contrary, MR. JUSTICE WHITE insists that § 1983 "was . . . expanded to encompass all statutory as well as constitutional rights." *Post*, at 654. I find this conclusion to be completely at odds with the legislative history of the statute and its jurisdictional counterparts.[24]

---

than confirm the view that §§ 5510 and 1979 were intended to be coextensive in scope. See *infra*, at 641–644. Nor does the observation that § 5510 might "operate differently . . . in a very few cases" from its antecedent provisions lend support to MR. JUSTICE WHITE's view. See n. 28, *infra*.

[24] Without offering his own interpretation of the legislative history, MR. JUSTICE WHITE now views that history as replete with "ambiguities, contradictions, and uncertainties." *Post*, at 669. These confusions, however, are for the most part not inherent in the legislative history. With all deference, it seems to me they are largely the product of his opinion concurring in the judgment.

For example, nothing in the legislative history of § 1983 or § 1343 (3), or in my analysis, implies that the 1866 Act "provided the outer limits of the federal civil rights effort in the post-Civil War years." *Post*, at 663. Indeed, provisions of both the 1870 and 1871 Acts go well beyond the 1866 law. Nor are the four "technical problems," see *post*, at 667–668, suggested by MR. JUSTICE WHITE apposite: (i) The revisers' statement that the rights secured by § 16 of the 1870 Act were to be protected against adverse state action by § 1979 does not require the conclusion that § 16 was the exclusive source of such rights. See n. 13, *supra*. (ii) Nor does it follow from the revisers' prediction that the courts would not construe rights "secured by the Constitution" to include rights "secured by a law authorized by the Constitution" that they thought that *every* federal statute would be encompassed by the phrase "any law providing for equal rights." To the contrary, they recognized that the unique relationship between the Constitution and the recently enacted civil rights statutes made it quite proper to refer to the latter as constitutional rights. See *supra*, at 632–633, and n. 14. (iii) The language in §§ 563 (12) and 1979 could indeed have been chosen more carefully. See *supra*, at 637. But the variations between these statutes are explained by the manner in which the revision was undertaken, see n. 15, *supra*, and do not preclude discovery of their precise meaning. (iv) If the revisers erred in limiting the jurisdictional provisions in the revision derived from § 3 of the 1866 Act to actions brought under color of state law, that error is quite independent

## III

The legislative history of §§ 1979, 629 (16), and 563 (12) notwithstanding, the opinion concurring in the judgment argues that the words "and laws" in § 1983 should be read broadly because the Court has given such a construction to similar language appearing in 18 U. S. C. §§ 241 and 242. This assertion is undermined, however, by the history of the statutes in question.

Section 242 originated in § 2 of the 1866 Act. As noted *supra*, at 627, § 2 made it a misdemeanor to deprive, under color of state law, any citizen of the rights specified in § 1 of that Act. Section 2 was repeated, with some modification, as § 17 of the 1870 Act. Section 17 made criminal the deprivation, under color of state law, of the rights enumerated in § 16.[25]

---

of and does not detract from their statement explaining the reference in § 629 (16) to equal rights laws. As I have shown, this reflects the correct interpretation of "and laws" in § 1983.

To be sure, no reading of history, including my understanding of the legislative history of § 1983, is beyond criticism. But any difficulties identified by MR. JUSTICE WHITE are inconsequential when compared with his disregard for Congress' unequivocal wish not to alter the content of federal statutory law. See Part I, *supra*. The arguments advanced in this opinion take full account of that legislative intent, while MR. JUSTICE WHITE's opinion largely assumes the very fact to be proved: that § 1983 "was . . . expanded [in the revision] to encompass all statutory . . . rights." *Post*, at 654. The direct evidence of Congress' intent with respect to the alterations made in the language of § 1983 flies directly in the face of this assumption. See *supra*, at 638–639, and n. 23.

While none of us is invariably consistent, MR. JUSTICE WHITE has not always disparaged the history of the post-Civil War civil rights legislation. In prior cases he has insisted that the 19th-century Civil Rights Acts should be read narrowly when such a construction is required by their legislative history. See *Runyon* v. *McCrary*, 427 U. S. 160, 192 (1976) (WHITE, J., dissenting); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 449 (1968) (Harlan, J., joined by WHITE, J., dissenting).

[25] The rights enumerated in § 16, of course, were taken directly from § 1 of the 1866 Act. See *supra*, at 628.

An entirely independent criminal provision of the 1870 Act, § 6, made a far broader sweep. It did not require that the conduct it proscribed be performed under color of state law, and it explicitly prohibited certain conduct intended to deprive a citizen of "any right or privilege granted or secured . . . by the Constitution *or laws of the United States."* (Emphasis added.) [26] Significantly, this is the only statute discussed in this or MR. JUSTICE WHITE's separate opinion in which the reference to statutory law as well as the phrase "rights secured by the Constitution" appears in the text originally drafted by Congress; in all other cases the reference to "laws" originated in the revision. Section 6 is thus the only one of these statutes for which there is a substantial argument that Congress truly intended to cover *all* federal statutory law.

Sections 6 and 17 of the 1870 Act were included in the revision as §§ 5508 and 5510, respectively, and MR. JUSTICE WHITE relies on the fact that both emerged with language that, on its face, covered all rights secured by federal statutory law. While he may well be correct that the words "Constitution or laws" in § 5508 should be taken at face value, the evidence does not support the same conclusion with respect to § 5510.

In the 1872 Draft of the revision, § 5510 was written to provide for criminal sanctions against deprivations, under color of state law, "of any right secured or protected by section —— of the Title CIVIL RIGHTS." 2 Draft 2627. Although no explanatory note accompanies this section, it is evident from the face of the text that the revisers were attempting to preserve the limited scope of § 17 of the 1870 Act by restricting its coverage to specifically enumerated rights. In the final version of the revision, the language had been changed, appar-

---

[26] The conduct proscribed included conspiracy, going "in disguise upon the public highway," and going "upon the premises of another."

ently by Mr. Durant,[27] see *supra*, at 625, to punish deprivations of rights "secured . . . by the Constitution and laws."

In light of the historical explanation of the meaning of "Constitution and laws" in § 1979, it is not surprising that this term should have been substituted for the language used in the draft of § 5510. As we have seen, in other contexts the appendage of "and laws" to "rights . . . secured by the Constitution" simply referred to the rights protected by the legislation enacted to provide for equal rights, as authorized by the recently adopted Amendments to the Constitution. Indeed, the House debates make explicit the fact that the change from the revisers' draft of § 5510 to the text ultimately adopted was made simply to be certain that this criminal provision would encompass the rights covered by the existing civil rights statutes discussed at length in this opinion: § 1 of the 1866 Act, § 16 of the 1870 Act, and § 1 of the 1871 Act. See 2 Cong. Rec. 827–828 (1874) (remarks of Rep. Lawrence). There is no evidence that Congress intended § 5510 to cover all federal statutory law.[28]

Despite the apparent similarity of the language of 18 U. S. C. §§ 241 and 242, therefore, they are in fact very different in scope. There is solid historical justification for the view that § 241 "dealt with Federal rights and with all Federal rights, and protected them in the lump," *United States* v. *Mosley,* 238 U. S. 383, 387 (1915) (interpreting Rev. Stat. § 5508, currently 18 U. S. C. § 241), because the expansive

---

[27] In commenting on § 5510 during one of the special evening sessions of the House, see *supra*, at 638–639, Representative Lawrence attributed the final version of this statute to Mr. Durant. 2 Cong. Rec. 828 (1874).

[28] Although Representative Lawrence hypothesized that § 5510 "may operate differently from the original three sections in a very few cases," 2 Cong. Rec. 828 (1874), this is far from a suggestion that this provision was to have the breadth attributed to it by MR. JUSTICE WHITE. Indeed, a perusal of the House debates on the revision makes clear that any such intent would have been thoroughly inconsistent with the very purpose for which the House was then in session. See *supra*, at 639.

644

language was put there by Congress itself. The same simply is not true of § 242. Considered in its historical context, the addition of "and laws" to this statute requires a much more modest reading. Even if there are dicta in our opinions to the effect that §§ 241 and 242 cover an identical class of deprivations of rights, such a construction of § 242 was not made with the benefit of the close historical scrutiny necessary to a proper understanding of this law.[29] I agree with MR. JUSTICE WHITE that "and laws" means the same thing in § 1983 as in § 242.[30] I am convinced, however, that he misconstrues the phrase in both instances.

## IV

MR. JUSTICE WHITE states that he is "not disposed to repudiate" the dicta in some of our prior decisions. See *post,* at 658. It is, of course, true that several decisions contain statements premised upon the assumption that § 1983 covers a broad range of federal statutory claims. *E. g., Edelman* v. *Jordan,* 415 U. S. 651, 675 (1974); *Greenwood* v. *Peacock,* 384 U. S. 808, 829–830 (1966). But that assumption has been made uncritically. Until these cases, no prior opinion of the Court or of a Justice thereof has undertaken a close examination of the pertinent legislative history of § 1983, including the work of the commissioners who drafted the Revised Statutes of 1874. Thus, there is nothing in the cases cited by

---

[29] MR. JUSTICE WHITE's assertion that § 241 encompasses the same rights as § 242, is based in part upon dicta in opinions that have merely assumed this fact without reasoned consideration of the legislative history. See *United States* v. *Price,* 383 U. S. 787, 797 (1966); *Screws* v. *United States,* 325 U. S. 91, 119 (1945) (Rutledge, J., concurring in result). The proper scope of § 242 is not an issue in this case, except as circumstantial evidence of the meaning of § 1983. In light of the discussion above, there clearly are substantial reasons to doubt the correctness of the dicta concerning § 242 upon which MR. JUSTICE WHITE relies.

[30] The relevant text in 18 U. S. C. § 242 now reads: "secured . . . by the Constitution *or* laws." (Emphasis added.)

MR. JUSTICE WHITE that precludes a fresh look at this question.

In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), decided just last Term, the Court was willing to go beyond confessing error in previous dicta. Indeed, the Court squarely overruled the holding in *Monroe* v. *Pape,* 365 U. S. 167 (1961), that municipalities are not "persons" for purposes of § 1983, despite almost two decades of lower courts' reliance upon *Monroe,* and notwithstanding our exceptional reluctance to overrule our prior constructions of federal statutes. In a case such as this, where no square holdings have perpetuated our misapprehension of the meaning of § 1983, we should be the more willing to correct historical error.

In addition to the historical evidence of the intent of Congress and the revisers in enacting § 1983, there are weighty policy and pragmatic arguments in favor of the construction advanced by this opinion. It is by no means unusual for Congress to implement federal social programs in close cooperation with the States. The Social Security Act, which these cases allege was violated, is a good example of this pattern of cooperative federalism. If § 1983 provides a private cause of action for the infringement, under color of state law, of *any* federal right, then virtually every such program, together with the state officials who administer it, becomes subject to judicial oversight at the behest of a single citizen, even if such a dramatic expansion of federal-court jurisdiction never would have been countenanced when these programs were adopted. To be sure, Congress could amend or repeal § 1983, or, as MR. JUSTICE WHITE concedes, *post,* at 672, limit its application in particular cases. As we said in *Monell* v. *New York City Dept. of Social Services, supra,* at 695, however, we should not " 'place on the shoulders of Congress the burden of the Court's own error' " (quoting *Girouard* v. *United States,* 328 U. S. 61, 70 (1946)). That problem is avoided if § 1983 is read, as it

should be, as encompassing only rights secured by the Constitution and laws providing for equal rights.

MR. JUSTICE WHITE, concurring in the judgment.

In order for there to be federal district court jurisdiction under 28 U. S. C. § 1343 (3), two requirements must be met. First, the suit must be "authorized by law," and, second, the suit must seek redress of a deprivation under color of state law of any right "secured by the Constitution of the United States or by any Act of Congress providing for equal rights . . . ."[1] Title 42 U. S. C. § 1983 provides a cause of action for deprivations under color of state law of any right "secured by the Constitution and laws" of the United States.[2] I agree with the Court's conclusion that, even assuming the claims in these cases—of inconsistency between state welfare practices and the Social Security Act—are "authorized by law" because they are within the reach of § 1983, the district courts do not have jurisdiction under § 1343 (3) because the claims do not involve deprivation of constitutional rights and the Social Security Act is not a law providing for equal rights.[3]

---

[1] Title 28 U. S. C. § 1343 (3) provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

.          .          .          .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

[2] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] My three dissenting Brethren conclude that § 1983 is the "equal rights" law referred to in § 1343 (3). But this construction makes superfluous

Yet I am not able to reach this conclusion without addressing the issue the Court does not resolve: whether §§ 1983 and 1343 (3) are coextensive. Both provisions were derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13,[4] which did not contain a jurisdictional provision separate from the cause of action. Rather, the 1871 Act stated that "such proceeding" as therein authorized would "be prosecuted in the several district or circuit courts of the United States . . . ."[5] However, for over a century—since the general statutory revision in 1874—the plain terms of the cause of action and the jurisdictional provision at issue here, § 1343 (3), have not been commensurate. In order to determine with confidence

---

§ 1343 (3)'s reference to constitutional claims, and renders unnecessary the nearly precise repetition in § 1343 (3) of the recital in § 1983 specifying suits brought against action "under color of any statute, ordinance, regulation, custom or usage." Further, the legislative evolution of § 1343 (3) cannot support the construction urged by the dissent. See n. 44, *infra*.

[4] This provision read:

"[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases." 17 Stat. 13.

[5] The first section of the 1871 Act provided that the rules governing "rights of appeal" and other procedural matters would be those provided in § 3 of the Civil Rights Act of 1866, 14 Stat. 27. See n. 4, *supra*. Section 3 of the 1866 Act required, *inter alia*, that jurisdiction "shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect."

the scope of rights encompassed by either provision, it is necessary, I believe, to examine the evolution of and to construe both provisions.

Certainly the issue of the reach of the § 1983 cause of action has been properly preserved for review in this Court.[6] Throughout the history of this litigation, the aid recipients have urged that §§ 1983 and 1343 (3) are necessarily congruent, and that their claims are encompassed by both provisions.[7] My three dissenting Brethren are of this view. On the other hand, the State of New Jersey and my Brother

---

[6] Nor can the significance of this controversy be gainsaid. If § 1983 does not encompass the claims in these cases, then not only is § 1343 jurisdiction defeated, but, unless some other authority for bringing suit were ascertained, general federal-question jurisdiction under 28 U. S. C. § 1331 also would not be available—even were the requisite amount in controversy—because a claim under § 1983 would not be stated. Persons alleging inconsistency between state welfare practices and federal statutory requirements, or asserting state infringement of any federal statutory entitlement unrelated to equal or civil rights, would be precluded from having such claims heard in federal court unless authorized to do so by the statute granting the entitlement.

In 1978, the House of Representatives passed legislation that would remove the amount-in-controversy requirement in all federal-question suits under § 1331. H. R. 9622, 95th Cong., 1st Sess. (1978).

[7] Plaintiff recipients in both cases alleged a cause of action under § 1983, and in each case the District Court refused the state officials' motion to dismiss for failure to state a claim upon which relief could be granted. Both District Courts further held that there was jurisdiction over the § 1983 cause of action under 28 U. S. C. § 1343. *Houston Welfare Rights Organization* v. *Vowell*, 391 F. Supp. 223 (SD Tex. 1975); 418 F. Supp. 566 (NJ 1976). On appeal, the Fifth Circuit, in No. 77–719, affirmed both these findings below, as well as the holding for recipients on the merits of the claim under the Social Security Act. *Houston Welfare Rights Organization* v. *Vowell*, 555 F. 2d 1219 (1977). In No. 77–5324, the Third Circuit assumed for purposes of addressing the § 1343 issue that a cause of action was stated under § 1983, and went on to direct dismissal for want of jurisdiction. 560 F. 2d 160 (1977). Respondents in No. 77–5324 continue to press the position that recipients have not stated a § 1983 cause of action.

POWELL appear to be of the view that while the two provisions are necessarily of equal scope, neither reaches the claims in these cases. The Court, by not resolving the scope of § 1983, apparently rejects the view that the two sections are necessarily coextensive.[8] However, it leaves open the possibility embraced by the State of New Jersey and my Brother POWELL that the claims in these cases are encompassed by neither § 1983 nor § 1343 (3).

I would and do reject this possibility. The provisions are not of equal scope: Although the suits in these cases are authorized by § 1983, they are not within the jurisdiction of the federal courts under § 1343 (3). The legislative history supports this view when approached with readiness to believe that Congress meant what the plain words it used say, as we have been taught is the proper approach to civil rights legislation originating in the post-Civil War days. See *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 436–437 (1968); *United States* v. *Price,* 383 U. S. 787 (1966); *United States* v. *Guest,* 383 U. S. 745 (1966). The conclusion that § 1983 provides a remedy for deprivations under color of state law for federal statutory as well as constitutional rights not only reflects a straightforward and natural reading of its language, but also is supported by our cases that have assumed or indicated in dicta that this is the correct construction of the provision, as well as by our decisions giving the same construction to the post-Civil War statutes criminalizing invasions of federal rights in language almost identical to that found in § 1983. On the other hand, the conclusion that § 1343 (3) encompasses only rights granted under "equal rights" statutes, in addition to constitutional rights, is compelled because of the equally plain terms of that statute and the absence of any overriding indication in the

---

[8] See *ante,* at 616 (§ 1983 and § 1343 (3) "coverage is, or at least originally was, coextensive"). Previous cases have occasionally referred to § 1343 (3) as the jurisdictional counterpart of § 1983, see *Examining Board* v. *Flores de Otero,* 426 U. S. 572, 583 (1976); *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 540 (1972).

legislative history that these plain terms should be ignored. The argument of my Brother POWELL that § 1983 was intended to remedy only those rights within the "equal rights" ambit of § 1343 (3) is not at all convincing with respect to the meaning to be attached to its predecessor, § 1979 of the Revised Statutes of 1874, at the time it was adopted, much less with respect to the construction to be accorded it in the light of developments during the last century.

## I

The first post-Civil War legislation relevant to ascertaining the meaning of §§ 1983 and 1343 (3) is the Civil Rights Act of 1866, 14 Stat. 27. Section 1 of that Act secured to all persons, with respect to specified rights, such as the right to contract, "the same right . . . as is enjoyed by white citizens." Under § 2 of the 1866 Act, deprivation of these rights under color of state law was a misdemeanor.[9] Section 3 of the Act provided concurrent district and circuit court jurisdiction "of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them" by § 1. Section 3 also provided for removal of certain criminal and civil cases from federal court. Unlike § 2, neither § 1 nor § 3 was limited to deprivations arising

---

[9] Section 2 of the Civil Rights Act of 1866 provided:

"[A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is proscribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court." 14 Stat. 27.

under color of state law.[10]  *Jones* v. *Alfred H. Mayer Co.,
supra,* at 420–437.

Because of uncertainty as to its authority under the Thirteenth Amendment to enact the foregoing provisions, Congress in §§ 16 and 17 of the Enforcement Act of 1870, 16 Stat. 144, substantially re-enacted §§ 1 and 2 of the 1866 Act pursuant to § 5 of the Fourteenth Amendment, which had been ratified in the interim.  Although § 8 of the 1870 Act provided for concurrent district and circuit court jurisdiction "of all causes, civil and criminal, arising under this act, except as herein otherwise provided," § 18 re-enacted the 1866 Act by reference and provided that §§ 16 and 17 would be enforced according to the provisions of the 1866 Act.  Further, § 6 of the 1870 Act made it a crime to conspire to deny any person "any right or privilege granted or secured . . . by the Constitution or laws of the United States."  In contrast to § 17 (re-enacting § 2 of the 1866 Act), which criminalized only color-of-law deprivations of the specified rights of equality guaranteed by § 16, § 6 reached *"all* of the rights and privileges" secured by *"all* of the Constitution and *all* of the laws of the United States." *United States* v. *Price, supra,* at 800 (emphasis in original).[11]

Section 1 of the Civil Rights Act of 1871, following the lead of the 1866 and 1870 Acts in opening the federal courts to remedy deprivations of federal rights, created a new civil remedy neither repetitive of nor entirely analogous to any of the provisions in the earlier Civil Rights Acts.  Section 1 of the 1871 Act, like § 17 of the 1870 Act, provided redress only for deprivations of rights under color of state law.  But whereas § 17 applied only where there was deprivation of the rights of equality secured or protected by § 16 (re-enacting § 1

---

[10] See *In re Turner,* 24 F. Cas. 337 (No. 14,247) (CC Md. 1867); *United States* v. *Rhodes,* 27 F. Cas. 785 (No. 16,151) (CC Ky. 1866).

[11] See, *e. g., United States* v. *Hall,* 26 F. Cas. 79 (No. 15,282) (CC SD Ala. 1871) (right of peaceable assembly and free speech within § 6 of Civil Rights Act of 1870).  See generally *United States* v. *Guest,* 383 U. S. 745 (1966); *United States* v. *Mosley,* 238 U. S. 383, 387–388 (1915).

of the 1866 Act), the new civil remedy in the 1871 Act encompassed deprivations of "any rights, privileges, or immunities secured by the Constitution of the United States." [12]   In this respect it was similar to the criminal provision provided in § 6 of the 1870 Act, which, however, encompassed invasions of any federal statutory, as well as constitutional, right.   Moreover, although the new civil remedy did not reach deprivations under color-of-law of statutory rights, neither did it modify or replace remedies under the 1866 and 1870 Acts for deprivations of rights of equality specified therein, which remedies were applicable to private deprivations as well as deprivations under color of state law,[13] see Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323, 1326–1328 (1952).

---

[12] During the debate on the Civil Rights Act of 1871, Representative Shellabarger explained that the "model" for the provision was § 2 of the 1866 Act, which "provides a criminal proceeding in identically the same case as this one provides a civil remedy," Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871).   However, Representative Shellabarger also stressed the broadened scope of § 1 of the 1871 Act:

"[Section 1] not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." *Ibid.*

See also *id.*, at App. 216–217 (Sen. Thurman):

"This section relates wholly to civil suits. . . . Its whole effect is to give to the Federal Judiciary that which does not now belong to it . . . . It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy."

[13] The remaining portions of the 1871 Act were directed to suppressing the terror of the Ku Klux Klan.   Section 2, which did not have a color-of-law requirement, defined the crimes, *inter alia,* of conspiracy to prevent federal officials from enforcing the laws of the United States, and of conspiracy to deprive "any person or any class of persons of the equal protection of the laws."   Jurisdiction was to be in federal district or circuit courts.   In addition, § 2 provided that persons injured in violation of

As relevant for present purposes, this was the status of civil rights legislation when the Revised Statutes of 1874 were adopted. With respect to the matters at issue here, the 1874 revision of the federal statutory law did not appreciably alter the substantive rights guaranteed or secured by the federal law. Federal constitutional rights, of course, could not have been amended by the revision. Furthermore, insofar as material to these cases, there were no substantive statutory rights newly created, modified, or eliminated.[14] Thus, § 16 of the 1870 Act, in essence a restatement of § 1 of the 1866 Act, survived but was split into two sections of the Revised Statutes, §§ 1977 and 1979.[15] These two sections remained a declaration of rights that all citizens in the country were to have against each other, as well as against their Government. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968).

With respect to the remedial power of the federal courts, however, the 1874 revision effected substantial changes[16] that are relevant to the present discussion.

---

such conspiracies "or deprived of having and exercising any right or privilege of a citizen of the United States . . . may have and maintain an action for the recovery of damages . . . , such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of" § 3 of the 1866 Act.

[14] The recodification was not generally undertaken for the purpose of altering the substantive provisions of federal law. See Revision of Statutes Act of 1874, § 2, 18 Stat. 113; Revision of Statutes Act of 1866, § 1, 14 Stat. 74.

[15] The former guaranteed to all persons "the same right" to contract, to sue, etc., "as is enjoyed by white citizens," and to be subject to like penalties and taxes. This provision, with minor word changes, is now 42 U. S. C. § 1981. Revised Statutes § 1978 guaranteed to all citizens "the same right . . . as is enjoyed by white citizens" to inherit, hold, and convey real and personal property. This section was the precursor of 42 U. S. C. § 1982.

[16] See 1 C. Bates, Federal Procedure at Law 473 (1908) ("The original judiciary act, and many other federal statutes, were badly mutilated in the revision . . .").

First, in the area of crimes, while § 6 of the 1870 Act (criminalizing private as well as color-of-law conspiracies to deprive persons of their federal constitutional or statutory rights) was retained essentially unchanged as § 5508 of the Revised Statutes, § 17 of the 1870 Act (the criminal provision originally enacted as § 2 of the 1866 Act and directed solely at deprivations under color of state law) was expanded to parallel § 5508. Section 17 had criminalized only the infringement of the specific rights of equality guaranteed by § 16 of the 1870 Act, but the new provision, § 5510 of the Revised Statutes, was "broadened to include as wide a range of rights as [§ 5508] already did: 'any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States.'" *United States* v. *Price,* 383 U. S., at 803.

Second, the civil remedy directed solely at deprivations under color of law was likewise expanded to encompass all statutory as well as constitutional rights. Thus, whereas § 1 of the 1871 Act had provided for redress of color-of-law deprivations of rights "secured by the Constitution of the United States," § 1979 of the Revised Statutes provided a civil remedy for such deprivation of rights secured by the "Constitution and laws," the substantive federal rights protected thus mirroring those covered by §§ 5508 and 5510.[17] As noted with respect to the widened scope of § 5510: "The substantial change thus effected was made with the customary stout assertions of the codifiers that they had merely clarified and reorganized without changing substance." *United States* v. *Price, supra,* at 803 (footnote omitted).

Third, the jurisdictional provisions of the various Civil Rights Acts were split off and consolidated in the Revised Statutes. Section 3 of the 1866 Act (re-enacted under § 18 of the 1870 Act), which provided federal jurisdiction for "all causes . . . affecting persons . . . denied" the rights now

---

[17] Revised Statutes § 1979 read precisely as does 42 U. S. C. § 1983, see n. 2, *supra.*

stated in §§ 1977 and 1978, was entirely deleted. The jurisdictional provision of the 1871 Act, authorizing federal courts to entertain civil suits brought pursuant thereto, became the basis for the new jurisdictional provisions in the Revised Statutes, which were stated separately for the district and circuit courts. Thus, Rev. Stat. § 563 (12) invested the district courts with jurisdiction over all civil actions—without regard to the amount in controversy—for any deprivation under color of state law of any rights "secured by the Constitution of the United States, or . . . by any law of the United States . . . ."[18] This jurisdictional grant tracked the expanded remedy provided in § 1979.

With respect to the circuit courts, however, Rev. Stat. § 629 (16) provided jurisdiction over deprivation under color of state law of federal constitutional rights—without regard to the amount in controversy—but stopped short of encompassing suits involving violations of statutory rights, referring only to any right "secured by the Constitution of the United States, or . . . by any law providing for equal rights . . . ."[19] Nonetheless, the circuit courts as well as the district courts were separately provided with criminal jurisdiction over cases arising under §§ 5508 and 5510, both of which reached deprivation of rights secured not only by the Constitution but by any law of the Union.[20]

Thus, under the Revised Statutes of 1874 the federal circuit

---

[18] Section 563 (12) of the Revised Statutes provided jurisdiction for actions alleging deprivation under color of state law of "any right, privilege, or immunity secured by the Constitution of the United States, or of any right secured by any law of the United States to persons within the jurisdiction thereof."

[19] Section 629 (16) of the Revised Statutes provided jurisdiction for suits to redress the deprivation under color of state law of "any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

[20] See Revised Statutes of 1874, §§ 563 (1), 629 (20).

courts were not empowered to entertain certain categories of suits brought to vindicate federal statutory rights against state invasion. Of course, at this time neither the district nor circuit courts had been granted general federal-question jurisdiction; rather, they existed to deal with diversity cases and suits in specialized areas of federal law such as federal criminal prosecutions, civil suits by the United States, and civil rights cases. In 1875, however, Congress extended to the circuit courts original jurisdiction, concurrent with the courts of the several States, "of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and arising under the Constitution or laws of the United States, or treaties made . . . ." Act of Mar. 3, 1875, 18 Stat. 470.[21] Thereafter, on the face of the statutes, the circuit courts had original jurisdiction, if the jurisdictional amount was satisfied, over any suit arising under the Constitution or any law of the United States, as well as jurisdiction, without regard to the amount in controversy, of any case involving a color-of-state-law deprivation of any constitutional right or any right secured by law pro-

---

[21] There is remarkably little contemporaneous legislative comment concerning the grant of federal-question jurisdiction in 1875. As originally passed by the House of Representatives, the legislation conformed to its title, "An act regulating the removal of causes from State courts to the circuit courts of the United States," and dealt only with cases involving diversity of citizenship. 2 Cong. Rec. 4301–4304 (1874). However, as it emerged from the Senate Judiciary Committee, the bill provided both for removal and for original jurisdiction of the circuit courts of federal-question cases. See id., at 4979. After heated debate concerning primarily the broad venue provisions in the legislation, the Senate enacted the bill, and directed that its title be amended to read:

"An act to determine the jurisdiction of the circuit courts of the United States and to regulate the removal of causes from State courts, and for other purposes." Id., at 4979–4988.

In conference, the House agreed to the Senate's changes in the original legislation. See also F. Frankfurter & J. Landis, The Business of the Supreme Court 65–68, and n. 34 (1928).

viding for equal rights.[22]   The district courts had no general "arising under" jurisdiction but retained their original jurisdiction over suits alleging deprivation under color of state law of any right secured either by the Constitution or by any law of the United States, without regard to the amount in controversy.

With the adoption of the 1911 Judicial Code, the circuit courts were abolished, and the district courts became the sole federal courts of first instance.   The principal elements of the district court's jurisdiction included diversity cases involving in excess of $3,000,[23] all cases arising under the Constitution or laws of the United States involving in excess of $3,000,[24] all criminal offenses under the federal laws—including those arising under Rev. Stat. §§ 5508 and 5510 [25]—and a series of specialized types of federal-law cases having no amount-in-controversy requirement.[26]   Included in this latter category was § 24 (14), which provided jurisdiction for all suits at law or in equity to redress deprivation under color of state law "of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."   With minor changes in wording, this provision is now codified at 28 U. S. C. § 1343 (3).

The language of Rev. Stat. § 1979 (now codified at 42 U. S. C. § 1983) remained unchanged, providing a federal

---

[22] The grant of general federal-question jurisdiction, with its $500 amount-in-controversy requirement, did not diminish the grants of jurisdiction not subject to this requirement. *Lynch* v. *Household Finance Corp.*, 405 U. S., at 547–549.

[23] § 24 (1), Judiciary Act of 1911, 36 Stat. 1091.

[24] *Ibid.*

[25] § 24 (2).

[26] See, *e. g.*, § 24 (3) (admiralty jurisdiction); § 24 (16) (jurisdiction over certain suits involving national banks); § 24 (22) (jurisdiction over suits involving, *inter alia,* labor laws).

cause of action for color-of-law deprivations of any right "secured by the Constitution and laws." On the face of the jurisdictional statutes, then, it would appear that after 1911 § 1983 cases could be brought in federal court under general federal-question jurisdiction if they involved the necessary amount in controversy; otherwise, they could be entertained in federal court only if they sought redress for deprivation of a constitutional right or of a right under a federal statute providing for equal rights.

## II

Having examined the context in which the foregoing statutory developments occurred, I agree with the Court that there is nothing in the relevant provisions or in their history that should lead us to conclude that Congress did not mean what it said in defining the jurisdiction of the circuit and district courts in 1874 or, much less, that in adopting the Judicial Code in 1911, Congress meant the language "any law of the United States providing for equal rights" to mean "any law of the United States."

By the same token, I also conclude that nothing in the history and evolution of § 1983 leads to the conclusion that Congress did not mean what it said in 1874 in describing the rights protected as including those secured by federal "laws" as well as by the "Constitution." I am, therefore, not disposed to repudiate the view repeatedly stated in previous cases that § 1983 encompasses federal statutory as well as constitutional entitlements. Although the Court has not previously given extended consideration to the scope of the rights protected by § 1983,[27] our acceptance of the plain terms of that statute and

---

[27] Until *Hague* v. *CIO,* 307 U. S. 496 (1939), there were few cases in this Court explicitly dealing with the scope of 42 U. S. C. § 1983, and those decisions did not raise the issue of the meaning of the "and laws" term in the statute. Some of the early cases were dismissed for failure to allege a deprivation under "color of law." See, *e. g., Huntington* v. *City*

analogous criminal proscriptions has been consistent, and for over a century Congress has not acted to rectify any purported error in our construction of these provisions.

Until today, we have expressly declined, most recently in *Hagans* v. *Lavine*, 415 U. S. 528, 533–535, n. 5 (1974),[28] to indicate whether Social Security Act claims based solely on alleged inconsistency between state and federal law might be

---

*of New York*, 193 U. S. 441 (1904); *Barney* v. *City of New York*, 193 U. S. 430 (1904). The concept of state action relied upon in these opinions was rejected in *Home Tel. & Tel. Co.* v. *Los Angeles*, 227 U. S. 278 (1913). See also *Devine* v. *Los Angeles*, 202 U. S. 313 (1906); *Chrystal Springs Land & Water Co.* v. *Los Angeles*, 177 U. S. 169 (1900) (claim that city is taking water in violation of treaty with Mexico and federal statute; held: no federal question is raised because the issue involves right under state or general law). Other cases were dismissed because the right alleged to have been denied was not directly "secured" by the Constitution. See, *e. g.*, *Carter* v. *Greenhow*, 114 U. S. 317 (1885), holding that an action for damages against a state tax collector did not state a cause of action under Rev. Stat. § 1979 because the right to pay taxes in coupons arose under state, rather than federal, law; and *Bowman* v. *Chicago & Northwestern R. Co.*, 115 U. S. 611 (1885), dismissing an appeal because the claim that a railroad had unlawfully refused to carry goods alleged denial of a right secured not by the Constitution, but if at all by a "principle of general law" governing the obligations of common carriers, *id.*, at 615. In *Holt* v. *Indiana Mfg. Co.*, 176 U. S. 68, 72 (1900), the Court held that a claim alleging that a tax on federal patent rights violated the Contracts, Due Process, and Equal Protection Clauses was not encompassed by Rev. Stat. §§ 1979 and 629 (16), or § 563 (12), because those provisions dealt only with "civil rights" claims, whether asserted under the Federal Constitution or federal statutes. Of course, this limited view of the nature of the constitutional rights encompassed by §§ 1983 and 1343 (3) has not been accepted in later cases, see n. 43, *infra*. Finally, *Giles* v. *Harris*, 189 U. S. 475 (1903), although holding that a federal court had no equitable power under Rev. Stat. § 1979 to order enrollment of blacks on a state voting list because, *inter alia*, voting involved "political rights," 189 U. S., at 487, did state that the claim that the right to vote had been denied was within § 1979, 189 U. S., at 485–486.

[28] See also *Burns* v. *Alcala*, 420 U. S. 575, 577 n. 1 (1975); *Rosado* v. *Wyman*, 397 U. S. 397, 404 n. 4 (1970); *King* v. *Smith*, 392 U. S. 309, 312 n. 3 (1968).

within the jurisdiction of the federal courts under § 1343. But we have not doubted the propriety of challenging under the "and laws" provision of § 1983 state action involving deprivation of federal statutory rights. On the very day the jurisdictional issue was reserved in *Hagans,* the Court stated in *Edelman* v. *Jordan,* 415 U. S. 651, 675 (1974):

> "It is, of course, true that *Rosado* v. *Wyman,* 397 U. S. 397 (1970), held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States."

And in *Greenwood* v. *Peacock,* 384 U. S. 808, 829–830 (1966), the Court noted that "[u]nder 42 U. S. C. § 1983 (1964 ed.) the [state] officers may be made to respond in damages not only for violations of rights covered by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well." Other dicta recognizing that § 1983 encompasses statutory federal rights are found in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 700–701 (1978); [29] *Mitchum* v. *Foster,* 407 U. S. 225, 239–240, n. 30 (1972); [30] *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 543 n. 7 (1972); [31] and *Hague* v. *CIO,* 307 U. S. 496, 525–526 (1939) (opinion of Stone, J.).[32]

Under the holding in *Hagans, supra,* at 536, that a federal court has power to hear a pendent claim based on the Social

---

[29] "[T]here can be no doubt that § 1 of the Civil Rights Act [of 1871] was intended to provide a remedy to be broadly construed, against all forms of official violation of federally protected rights."

[30] "[Section 1983] in the Revised Statutes of 1874 was enlarged to provide protection for rights, privileges, or immunities secured by federal law as well [as those secured by the Constitution]."

[31] "[T]he provision in the Revised Statutes was enlarged to provide protection for rights, privileges, or immunities secured by federal law as well [as those secured by the Constitution]."

[32] "The right of action given by [§ 1 of the Civil Rights Act of 1871] was later . . . extended to include rights, privileges and immunities secured by the laws of the United States as well as by the Constitution."

Security Act when a substantial constitutional claim is also raised,[33] a cause of action for the pendent statutory claim must still be "authorized by law" in order for the claim to be cognizable in federal court under § 1343. That cause of action in *Hagans*, as in previous decisions of this Court that have reviewed the statutory claim, was provided by § 1983.

Likewise, our previous cases construing Rev. Stat. § 5508 (now 18 U. S. C. § 241) and Rev. Stat. § 5510 (now 18 U. S. C. § 242)—each of which describes the rights protected in language nearly identical to that used in § 1983 [34]—leave no doubt that federal statutory as well as constitutional entitlements are encompassed thereby.

One of the first cases [35] construing what is now § 241 held that the rights "secured by the Constitution or laws" included homesteading rights granted in §§ 2289–2291 of the Revised Statutes. *United States* v. *Waddell*, 112 U. S. 76 (1884).[36] In

---

[33] The Court does not question the continuing validity of *Hagans*. Indeed, the Court's remand in No. 77–719 leaves open the opportunity for respondents to seek to amend their complaint to allege, if they can, a nonfrivolous constitutional claim. Their statutory claim, on which suit is authorized by § 1983, would then qualify as a pendent claim within the jurisdiction of the District Court, as both *Rosado* and *Hagans* recognize.

[34] Title 18 U. S. C. §§ 241 and 242 encompass the same rights. See *United States* v. *Price*, 383 U. S. 787, 797 (1966); *United States* v. *Guest*, 383 U. S., at 753; *Screws* v. *United States*, 325 U. S. 91, 119 (1945) ("There are, however, no differences in the basic rights guarded [by §§ 241 and 242]") (opinion of Rutledge, J.).

[35] Another early case, *United States* v. *Cruikshank*, 92 U. S. 542 (1876), concerned convictions under what is now § 241 of persons accused of disrupting a meeting of blacks, and proceeding to lynch two of those who had been at the meeting. The Court held that because the right of peaceable assembly was an attribute of national citizenship, 92 U. S., at 551, rather than a right granted initially by the Constitution, deprivation of this right was not proscribed by the "Constitution or laws" language of § 6 of the Civil Rights Act of 1870.

[36] Three years later, the Court concluded that discrimination against Chinese in contravention of a treaty between the United States and China would be within the proscription of § 241 but for the language in that

*Logan* v. *United States,* 144 U. S. 263, 293–295 (1892), the Court was noticeably careful to hold that the right to be secure from unauthorized violence while in federal custody was secured "by the Constitution and laws of the United States." Accord, *In re Quarles,* 158 U. S. 532, 537–538 (1895). Moreover, subsequent decisions on the scope of §§ 241 and 242, examining issues not here relevant, have cited *Waddell, Logan,* and *Quarles* approvingly in the respect considered above. See *United States* v. *Mosley,* 238 U. S. 383, 386–387 (1915); *Screws* v. *United States,* 325 U. S. 91, 108–109 (1945) (opinion of Douglas, J.); *id.,* at 124–126, and n. 22 (opinion of Rutledge, J.); *United States* v. *Williams,* 341 U. S. 70, 80 (1951) (*Williams II*) (opinion of Frankfurter, J.); *United States* v. *Guest,* 383 U. S., at 771 (opinion of Harlan, J.); *id.,* at 759 n. 17; *United States* v. *Price,* 383 U. S., at 805 n. 18.

As noted, §§ 242 and 1983 were both derived from post-Civil War legislation providing redress for invasions of rights under color of state law. In the Revised Statutes of 1874, § 242 was expanded to encompass all constitutional rights, and both provisions were expanded to encompass rights secured by federal "laws." The color-of-law requirement in each is the same.[37] Apart from differences relating to the nature of the remedy invoked,[38] they are commensurate. See *Monroe* v. *Pape,* 365 U. S. 167, 183–185 (1961). Accordingly, I would hold with respect to 42 U. S. C. § 1983, as had been impliedly held with respect to 18 U. S. C. § 242, that the term "laws" encompasses all federal statutes. Like §§ 241 and 242, § 1983

---

statute limiting its application to denials of the rights of "citizens." *Baldwin* v. *Franks,* 120 U. S. 678, 690–692 (1887); see also *id.,* at 694 (Harlan, J., dissenting).

[37] *Monroe* v. *Pape,* 365 U. S. 167, 185 (1961).

[38] Specific intent is required for conviction under either § 241 or § 242. *United States* v. *Guest, supra,* at 753–754; *Screws* v. *United States, supra.* The word "willfully" was added to § 242 in 1909, 35 Stat. 1092, but such language has never been in § 1983. See *Monroe* v. *Pape, supra,* at 206 (opinion of Frankfurter, J.).

must be deemed to have "dealt with Federal rights and with all Federal rights, and [to have] protected them in the lump." *United States* v. *Mosley, supra,* at 387. There can be "no basis whatsoever for a judgment of Solomon which would give to the statute less than its words command." *United States* v. *Price, supra,* at 803.

### III

It is earnestly argued, however, that 42 U. S. C. § 1983, formerly Rev. Stat. § 1979, and 18 U. S. C. § 242, formerly Rev. Stat. § 5510, should be read as protecting against deprivation under color of state law only constitutional rights and rights granted under federal "equal rights" statutes. A corollary of this argument is that, although in 1874 Congress expressly invested the district courts with jurisdiction over all civil cases involving state interference with *any* right secured by the Constitution or by *any* federal law, see Rev. Stat. § 563 (12), Congress actually meant to refer, in addition to the Constitution, only to equal rights laws.

To the extent that these arguments are rooted in the notion that the 1866 Civil Rights Act provided the outer limits of the federal civil rights effort in the post-Civil War years, and thus implicitly limits the reach and scope of the relevant portions of the 1870 and 1871 Acts, they are quite unpersuasive. The 1870 Act, it is true, re-enacted the 1866 Act, but it also provided its own unique approaches, such as that adopted in § 6, proscribing private or public conspiracies interfering not merely with the specific rights of equality cataloged in § 1 of the 1866 Act, but with any right secured by federal constitutional or statutory law. Similarly, it cannot be supposed that in § 1 of the 1871 Act, Congress was merely granting a private cause of action for vindicating rights of equality with respect to enumerated activities within state legislative power, secured by § 1 of the 1866 Act, re-enacted as § 16 of the 1870 Act. The 1871 provision granted a remedy and jurisdiction in the federal courts to protect against state invasions of *any* and *all* constitutional rights; and whereas

this cause of action applied only to invasions under color of state law, the earlier provisions applied as against private persons as well, with federal jurisdiction to hear "all causes . . . affecting persons" denied the specific, enumerated rights. Thus, the very limiting construction urged of the term "and laws" as used in the Revised Statutes of 1874 cannot withstand scrutiny if predicated upon the proposition that the sole concern of the post-Civil War enactments was with vindicating particular rights of equality.

The more specific basis for the argument that the scope of § 1983 should be narrowed to less than its plain terms relates to the grant of civil rights jurisdiction to the circuit courts in the Revised Statutes. It is asserted that just as Congress limited the jurisdiction of those courts to suits involving constitutional rights or statutory rights secured in "equal rights" statutes, it intended likewise to confine the jurisdiction of the district courts under § 563 (12), the remedy provided by § 1979, and the criminal proscriptions in § 5510. However, the marginal notes and cross-references in the Revised Statutes for each of these provisions are as broad as the plain terms of the statutes themselves,[39] and at least as to the civil cause of action and criminal proscription against deprivation under color of state law, we know that the alteration in

---

[39] The marginal notation for § 563 (12) states: "Suits to redress the deprivation of rights secured by the Constitution and laws to persons within jurisdiction of United States." Cross-cites are to § 1 of the 1871 Act, §§ 16, 18 of the 1870 Act, and § 3 of the 1866 Act; § 1 of the 1871 Act had referred to § 3 of the 1866 Act for the rules governing appeal and other matters, see n. 5, supra. In addition, there is a bracketed citation after the text of § 563 (12)—and after § 629 (16)—as follows: "[See §§ 1977, 1979]." Rev. Stat. 95, 111 (1874).

The marginal notation for § 1979 states: "Civil action for deprivation of rights." Section 1 of the 1871 Act is cross-cited, and there is a bracketed citation to § 563 and § 629. Rev. Stat. 348 (1874).

The marginal notation for § 5510 states: "Depriving citizens of civil rights under color of State laws." The cross-cite is to § 17 of the 1870 Act, and there is a bracketed citation to § 1979. Rev. Stat. 1074 (1874).

terms was noted on the floor of the Congress that enacted the Revised Statutes.[40] In fact, the marginal notations, as well as the entire statutory scheme, indicate that if an error was made at some point, it was not in the drafting of § 563 (12), § 1979, or § 5510, all of which employed broad terminology reaching federal statutes, but in the drafting of the circuit court provision. The marginal notation in the Revised Statutes for § 629 (16), like that for the district court provision, refers to "Suits to redress deprivation of rights secured by the Constitution *and laws* . . ." [41] (emphasis added), the language of §§ 1979 and 5510.

Nor do I find as unambiguous and as persuasive as does my Brother POWELL the commentary of the revisers published in 1872 in connection with the anticipated definition of the circuit court's jurisdiction. 1 Revision of the United States Statutes as Drafted by the Commissioners Appointed for that Purpose 359–363 (1872) (hereinafter Draft). The revisers went to some length to explain their deletion of the jurisdictional language used in § 3 of the 1866 Act (re-enacted by ref-

---

[40] During the discussion of the Revised Statutes in Congress, Representative Lawrence read the relevant provisions of the post-Civil War Acts and then read § 1979. 2 Cong. Rec. 828–829 (1874). He went on to point out that whereas the version of § 5510 eventually enacted by Congress referred to rights secured by the "Constitution and laws," the revisers' initial version (that in the 1872 Draft) had referred only "to the deprivation of any right secured or protected by section —— of the title 'civil rights.'" Representative Lawrence explained that this initial version "certainly is not sufficiently comprehensive to include all covered by the first section of the 'Ku-Klux act' of April 20, 1871, and the omission is not elsewhere supplied . . . ." The foregoing demonstrates that the commensurate scope of §§ 1979 and 5510 was purposeful; further, apparently believing that § 1 of the 1871 Act, as well as § 2 of the 1866 Act and § 17 of the 1870 Act, defined crimes, Representative Lawrence noted: "[I]t is possible that the new consolidated section [§ 5510] may operate differently from the three original sections in a very few cases. But the change, if any, cannot be objectionable, but is valuable as securing uniformity." 2 Cong. Rec. 828 (1874).

[41] See Rev. Stat. 111 (1874).

erence in § 18 of the 1870 Act). The provision, in granting jurisdiction for "all causes, civil and criminal, affecting persons" denied rights, appeared, according to the revisers, to "allow every person who is denied any civil right in the courts of his own State to invoke the judicial power of the United States in every kind of controversy . . . ." 1 Draft 362. The revisers explained that a literal interpretation of such language "would involve consequences which Congress cannot be supposed to have intended . . . ," *id.*, at 361, and further questioned whether such a broad grant of jurisdiction was even within the limitations of Art. III, § 2, of the Constitution, which, they noted, extended federal judicial power only to cases *"arising under this Constitution, the laws of the United States,* and treaties . . . ." 1 Draft 362 (emphasis in original). Thus, instead of using the jurisdictional language in § 3 of the 1866 Act, the revisers decided to track the language in § 1 of the 1871 Act, which provided jurisdiction only for suits involving "deprivation" of rights, rather than for all suits involving persons denied rights.

However, the revisers drafting the circuit court provision were not working from the new, and expanded, cause of action provided in § 1979, but from § 1 of the 1871 Act, which, they pointed out, referred to deprivation of rights *"secured by the Constitution of the United States."* 1 Draft 362 (emphasis in original). If this language were transferred verbatim to the new circuit court jurisdictional provision, "it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended . . . ." *Ibid.* Thus, the revisers thought it advisable—"deemed safer"—to include "a reference to the civil-rights act." My Brother POWELL is able to conclude from the foregoing [42] that

---

[42] The entire paragraph which for MR. JUSTICE POWELL provides the key to the revisers' view of the cause of action in § 1979 reads:

"It may have been the intention of Congress to provide, by [§ 1 of the 1871 Act], for all the cases of deprivations mentioned in the previous act

the only statutory rights the revisers had in mind—in §§ 1979 and 5510, as well as in the district and circuit court jurisdictional provisions—were those catalogued in § 16 of the 1870 Act, essentially a re-enactment of § 1 of the 1866 Act.

Beyond the most obvious and overriding difficulty with this approach to statutory construction—whereby the plain terms of three statutes are ignored on the basis of the revisers' commentary to a fourth and apparently inconsistent provision—there are several more technical problems with my Brother POWELL's approach. First, the reference ultimately included in the circuit court provision was not to § 16 of the 1870 Act, but to "any law providing for equal rights . . . ," a far broader reference than necessary to achieve what those writing the commentary apparently intended to achieve.

Second, if the revisers' comment is to be taken at face value, they must be held to have assumed that "every right secured by a law authorized by the Constitution" was secured by an "equal rights" statute, or even more incredibly, by § 16 of the 1870 Act. But surely my Brother POWELL cannot be suggesting that the Constitution is so limited, and such a narrow view of the constitutional rights protected by § 1983 has been firmly rejected by this Court.[43]

---

of 1870, and thus actually to supersede the indefinite provision contained in that act. But as it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended, it is deemed safer to add a reference to the civil-rights act." 1 Draft 362.

[43] See *Hague* v. *CIO,* 307 U. S. 496 (1939); *Monroe* v. *Pape,* 365 U. S. 167 (1961); *Lynch* v. *Household Finance Corp.,* 405 U. S. 538 (1972).

Unless he is also prepared to limit the reach of constitutional claims brought under § 1983, my Brother POWELL's construction of that statute would not allow claims based on federal statutory law to be heard unless they involved a right of equality, but claims based on the Constitution could involve alleged violations of not only the Equal Protection Clause, or even other provisions of the Fourteenth Amendment, but also any provision of the Constitution. It is hard to believe that Congress intended such asymmetry.

Third, if the revisers likewise intended only to accommodate the 1866 and 1870 Acts in the district court jurisdictional provision, § 563 (12), referring to rights secured by "any law of the United States" was a most peculiar and clumsy way of doing so.[44]

Fourth, if, as does indeed appear from the comment relied upon, it was the revisers' objective at least to provide jurisdiction for all suits alleging deprivation of the specific rights guaranteed in the 1866 and 1870 Acts, they failed in that attempt. Whereas § 3 of the 1866 Act had provided jurisdiction for suits alleging private, as well as color-of-law, deprivation of the rights enumerated, both § 629 (16) and § 563 (12), like § 1979, were limited to deprivations under color of state law.[45]

---

[44] My three dissenting Brethren, concluding that § 1983 is the "equal rights" law referred to in § 1343 (3), do not attempt to explain the broader provision in § 563 (12) of the Revised Statutes. Moreover, the revisers who added the equal rights language to the circuit court jurisdictional provision did not have the expanded version of the cause of action, with its "and laws" language, before them. Thus, even if it might be considered that the term "providing for equal rights" was intended to be a reference to § 1 of the 1871 Act, that section encompassed only constitutional claims. Given this legislative history, the approach of the dissent, requires, at bottom, that the word "Constitution" as used in the 1871 Act encompass federal statutory claims. But if this were so, there would be no need to resort to the circuitous construction whereby § 1983 is the "equal rights" law of § 1343 (3).

[45] In addition, the Revised Statutes added a precondition to civil rights jurisdiction that was not included in other jurisdictional provisions: that the suit must be "authorized by law." See §§ 563 (12), 629 (16). See also §§ 563 (11), 629 (17), providing jurisdiction for civil suits "authorized by law" against conspiracies in violation of § 2 of the 1871 Act, see n. 13, *supra,* which section became, with modification, § 1980 of the Revised Statutes, and is the precursor of 42 U. S. C. § 1985. The "authorized by law" requirement, which remains in 28 U. S. C. § 1343, appears to be another effort to preclude suits merely "affecting" persons denied rights, because no cause of action was provided for such suits.

Clearly, §§ 1979 and 1980 were statutes "authorizing" suits. In addi-

In view of the foregoing ambiguities, contradictions, and uncertainties, there is no satisfactory basis for overriding the clear terms of the Revised Statutes. The "customary stout assertions" of the revisers notwithstanding, it is abundantly obvious that the 1874 revision did change the terms of certain remedial and jurisdictional provisions. Congress was well aware of the broadened scope of § 1 of the 1871 Civil Rights Act as redrafted in the Revised Statutes. And, for whatever reason, the limiting words in the circuit court jurisdictional provision were accepted and enacted by Congress; if there was a slip of the pen, it is more arguable that the mistake occurred here.[46]

Almost immediately, however, the circuit courts were given general federal-question jurisdiction, and in "codifying, revising, and amending" the laws relating to the judiciary in 1911,[47] there is no indication whatsoever that Congress acted in less than a knowing and deliberate way in confining the jursdiction of the district courts—where the amount-in-

---

tion, it is evident that the revisers considered § 1 of the 1866 Act (and § 16 of the 1870 Act) directly to authorize suits redressing the deprivation of rights guaranteed thereunder, for the bracketed citations after the jurisdictional provisions, §§ 563 (12) and 629 (16), are to § 1977 as well as to § 1979, see n. 39, *supra*. This further supports the proposition that § 1 of the 1871 Act did not merely authorize civil suits to enforce the guarantees of the earlier Civil Rights Acts, see *supra*, at 663–664.

[46] It should also be noted that this was not the only instance in which the Revised Statutes of 1874 provided different circuit and district court jurisdiction for causes which, prior to the revision, could be heard in either court. The removal provision, § 641 of the Revised Statutes, provided for removal from a state court only to a circuit court even though the provision upon which § 641 was based, § 3 of the 1866 Act, provided for both district and circuit court jurisdiction. Congress also failed to provide for postjudgment removal in § 641, although such removal had been authorized under § 3 of the 1866 Act. See *Georgia* v. *Rachel*, 384 U. S. 780, 795 (1966).

[47] The legislation enacting the 1911 recodification provided that "the laws relating to the judiciary be, and they hereby are, codified, revised, and amended . . . to read as follows . . . ." 36 Stat. 1087.

controversy requirement was not met—to those color-of-law deprivations of rights secured by the Constitution or federal equal rights statutes.[48] The result is that since 1911, there have been some § 1983 suits not cognizable under § 1343 (3) and not cognizable in district court at all unless they involve the requisite jurisdictional amount under general federal-question jurisdiction. The effect of this amount-in-controversy prerequisite was and is to bar from the lower federal courts not only certain claims against state officers but also many private causes of actions not involving injury under color of law. Whatever the wisdom of precluding resolution of *all* federal-question cases in the federal courts—rather than leaving some of them to decision in the state courts (a course of action possibly in the process of being reversed by Congress) [49]—the uneven effect of this policy does not warrant refusal to recognize and apply the clear limiting language of § 1343 (3). Cf. *District of Columbia* v. *Carter,* 409 U. S. 418 (1973).

## IV

The foregoing examination of the evolution of §§ 1983 and 1343 (3) demonstrates to my satisfaction that the two provisions cannot be read as though they were but one statute.[50]

---

[48] See also Note, Federal Jurisdiction Over Challenges to State Welfare Programs, 72 Colum. L. Rev. 1404, 1423 (1972) ("Although the drafters of the 1911 Judicial Code may not have been particularly troubled by the substantive difference between sections 563 and 629, it seems unlikely that their choice of the circuit court language was inadvertent or arbitrary").

[49] See n. 6, *supra.*

[50] I also agree with the Court that 28 U. S. C. § 1343 (4) does not provide a basis for jurisdiction over the claims in these cases. Recognizing significant Court of Appeals authority to the contrary, see, *e. g., Andrews* v. *Maher,* 525 F. 2d 113 (CA2 1975); *Randall* v. *Goldmark,* 495 F. 2d 356 (CA1 1974); *Aguayo* v. *Richardson,* 473 F. 2d 1090 (CA2 1973), cert. denied *sub nom. Aguayo* v. *Weinberger,* 414 U. S. 1146 (1974), recipients have not contended that the welfare rights here at stake are "civil rights" within the meaning of that statute. However, they urge that even if § 1983 can-

The manifest object of the Reconstruction Congress to provide a private remedy for deprivation under color of state law of federal rights is one reason I am disposed to give no less than full credit to the language of § 1983. However, this conclusion that federal statutory claims are appropriately brought under § 1983 does not proceed to any extent from the notion that this statute, by its terms or as perceived when enacted, "secure[s]" rights or "provide[s] for equal rights," in the language of § 1343 (3). Title 42 U. S. C. §§ 1981 and 1982, derived from § 1 of the 1866 Civil Rights Act and codified at §§ 1977 and 1978 of the Revised Statutes, enunciate certain rights and state that they are to be enjoyed on the same basis by all persons. Thus, these statutes both secure rights and provide for equal rights, whereas § 1983, derived from § 1 of the Civil Rights Act of 1871, provides only a cause of action—a remedy—for violations of federally protected rights.

Perhaps it could be said that the very process of judicial redress for deprivation of rights "secures" such rights and

not be said to "provide" for equal rights within the meaning of § 1343 (3), this cause of action does operate to "protect" civil rights—by authorizing redress for their deprivation—within the meaning of § 1343 (4). Assuming, *arguendo,* the validity of this distinction, the cognizance of these claims under § 1983 is nonetheless insufficient to confer § 1343 (4) jurisdiction. To be sure, § 1983 actions are often brought to vindicate civil rights, and thus that section may loosely be characterized as a civil rights statute. However, under the view of that statute expressed in this opinion, the § 1983 cause of action is not always a civil rights cause of action, for it is appropriately invoked to vindicate *any* federal right against deprivation under color of state law. Indeed, as noted, recipients recognize that in the cases at hand, § 1983 is not being used to vindicate civil rights within the meaning of § 1343 (4). Therefore, in essence, recipients would have the Court transform statutory claims for welfare assistance into claims seeking "protection of civil rights" on the theory that such claims are encompassed by a statutory cause of action that in *other* cases is invoked to protect civil rights. Such logic is hardly compelling. The clear import of § 1343 (4) is to provide federal jurisdiction for civil rights claims, and no amount of bootstrapping can transform these claims for welfare assistance into civil rights claims.

"provides" that they shall be "equal" in the sense that they shall be enjoyed by all persons. I agree that without processes for their enforcement, the rights guaranteed in the Constitution and in federal statutes may not be fully realized. Further, provision of remedies for denial of rights to some persons is essential to realization of these rights for all persons. However, a remedy—a cause of action without more—guarantees neither equality nor underlying rights. It is, rather, a process for enforcing rights elsewhere guaranteed. The substantive scope of the rights which may be the basis for a cause of action within § 1343 (3) jurisdiction is limited to the Constitution and those federal statutes that guarantee equality of rights. The substantive scope of the rights which may be protected and vindicated under § 1983 against contrary state action, on the other hand, includes not only federal constitutional rights but also all rights secured by federal statutes unless there is clear indication in a particular statute that its remedial provisions are exclusive or that for various other reasons a § 1983 action is inconsistent with congressional intention.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join,* dissenting.

My disagreement with the opinion and judgment of the Court in these cases is narrow but dispositive. Because 28 U. S. C. § 1343 (3) refers to "any Act of Congress providing for equal rights," because 42 U. S. C. § 1983 is such an Act of Congress, and because § 1983 by its terms clearly covers lawsuits such as the ones here involved, I would hold that the plaintiffs properly brought these cases in Federal District Court.[1]

---

*MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL do not join footnote 2.

[1] Accordingly, I do not reach the question whether jurisdiction may also exist by reason of § 1343 (4), or the Supremacy Clause argument. I do agree with the Court that the Social Security Act itself is not a

First of all, it seems to me clear that this Court has already settled the question whether § 1983 creates a cause of action for these plaintiffs. We have explicitly recognized that the case of *"Rosado v. Wyman,* 397 U. S. 397 (1970), held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States." *Edelman v. Jordan,* 415 U. S. 651, 675.[2] And a long line of this Court's cases necessarily stands for that proposition. *Miller v. Youakim,* 440 U. S. 125; *Quern v. Mandley,* 436 U. S. 725; *Van Lare v. Hurley,* 421 U. S. 338; *Edelman v. Jordan, supra; Hagans v. Lavine,* 415 U. S. 528; *Carleson v. Remillard,* 406 U. S. 598; *Jefferson v. Hackney,* 406 U. S. 535; *Carter v. Stanton,* 405 U. S. 669; *Townsend v. Swank,* 404 U. S. 282; *California Dept. of Human Resources v. Java,* 402 U. S. 121; *Dandridge v.*

---

statute securing "equal rights" within § 1343 (3) or "civil rights" within § 1343 (4). Moreover, since the Court does not reach the merits in either of these cases, I see no need to discuss them, except to note that the result in No. 77–5324 is clearly controlled by *Quern v. Mandley,* 436 U. S. 725.

[2] Mr. Justice Black, joined by THE CHIEF JUSTICE, argued in dissent in *Rosado v. Wyman,* 397 U. S. 397, 430, that the plaintiff's claims should not be cognizable in a federal court. They argued that primary jurisdiction to consider whether state law comported with the Social Security Act should rest with the Department of Health, Education, and Welfare. The dissenting opinion did not suggest, however, that, apart from considerations of primary jurisdiction, no cause of action existed under § 1983.

Although the Court rejected the dissent's primary-jurisdiction argument for cases brought under the Social Security Act, a similar doctrine may restrict § 1983 suits brought for violations of other federal statutes. When a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983. For example, a suit alleging that a State has violated Title VII of the Civil Rights Act of 1964 must comply with the procedural requirements of that Act, even though such a suit falls within the language of § 1983.

*Williams,* 397 U. S. 471; *Rosado* v. *Wyman,* 397 U. S. 397; *King* v. *Smith,* 392 U. S. 309; *Damico* v. *California,* 389 U. S. 416. I think it is far too late in the day, therefore, to argue that the plaintiffs in these cases did not state causes of action cognizable in the federal courts.

Even if this impressive weight of authority did not exist, however, and the question before us were one of first impression, it seems clear to me that the plain language of § 1983 would dictate the same result. For that statute confers a cause of action for the deprivation under color of state law of "any rights . . . secured by the Constitution *and laws.*" Only if the legislative history showed unambiguously that those words cannot mean what they say would it be possible to conclude that there were no federal causes of action in the present cases. But, as the Court correctly states, "the legislative history of the provisions at issue in these cases ultimately provides us with little guidance as to the proper resolution of the question presented here." *Ante,* at 610.

The Court's reading of §§ 1983 and 1343 (3) results in the conclusion that Congress intended § 1983 to create some causes of action which could not be heard in a federal court under § 1343 (3), even though §§ 1983 and 1343 (3) both originated in the same statute (§ 1 of the so-called Ku Klux Klan Act). This anomaly is quite contrary to the Court's understanding up to now that "the common origin of §§ 1983 and 1343 (3) in § 1 of the 1871 Act suggests that the two provisions were meant to be, and are, complementary." *Examining Board* v. *Flores de Otero,* 426 U. S. 572, 583. See *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 542–552.

Section 1983 is a statute "providing for equal rights." The Revised Statutes of 1874 included § 1979, the predecessor of § 1983, in Title XXIV, entitled "Civil Rights." Several sections in the Title, including § 1979, were cross-referenced to the predecessors of § 1343 (3), Rev. Stat. §§ 563 (12) and 629 (16). In the context of the Revised Statues, the term "pro-

viding for equal rights" found in § 629 (16) served to identify the sections of the Civil Rights Title which involved rights enforceable through civil actions.

The Court's reasoning to the contrary seems to rely solely on the fact that § 1983 does not create any rights. Section 1343 (3) does not require, however, that the Act create rights. Nor does it require that the Act "provide" them. It refers to any Act of Congress that provides "for" equal rights. Section 1983 provides for rights when it creates a cause of action for deprivation of those rights under color of state law. It is, therefore, one of the statutes for which § 1343 (3), by its terms, confers jurisdiction upon the federal district courts.

Today's decision may not have a great effect on the scope of federal jurisdiction. If the amount in controversy exceeds $10,000, any plaintiff raising a federal question may bring an action in federal court under 28 U. S. C. § 1331 (a). Many other sections of Title 28 confer jurisdiction upon the federal courts over statutory questions without any requirement that a monetary minimum be in controversy. See, *e. g.*, 28 U. S. C. § 1333 (admiralty and maritime jurisdiction); 28 U. S. C. § 1334 (bankruptcy); 28 U. S. C. § 1337 (Acts of Congress regulating commerce). Still other plaintiffs will find their way into the federal courts through jurisdictional provisions codified with the substantive law, and not incorporated in Title 28. See, *e. g.*, 12 U. S. C. § 2614 (Real Estate Settlement Procedures Act of 1974); 15 U. S. C. § 1640 (e) (Truth in Lending Act); 42 U. S. C. § 7604 (1976 ed., Supp. I) (Clean Air Act). Finally, even a welfare recipient with a federal statutory claim may sue in a federal court if his lawyer can link this claim to a substantial constitutional contention. And under the standard of substantiality established by *Hagans* v. *Lavine, supra,* such a constitutional claim would not be hard to construct.

But to sacrifice even one lawsuit to the Court's cramped reading of 28 U. S. C. § 1343 (3) is to deprive a plaintiff of a

federal forum without justification in the language or history of the law.

I respectfully dissent.

MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL believe that the issue discussed in footnote 2 of this dissenting opinion need not be addressed in this case. They therefore express no view of the merits of that particular question.